UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

In re:

Samuel Jesse Christian Morreale,

Debtor.

Bankruptcy Case No. 13-27310 TBM

Chapter 7

_____

### ORDER ON DEBTOR'S STANDING AND DEBTOR'S PROOF OF CLAIM
_____

The central issue before the Court is whether the Chapter 7 Debtor, Samuel Jesse Christian Morreale (the "Debtor"), has legal standing to object to matters concerning administration of his own Chapter 7 bankruptcy estate.  Tom H. Connolly, the duly-appointed Chapter 7 Trustee (the "Trustee"), filed motions to sell certain of the Debtor's assets (membership interests in two limited liability companies formed to own and operate a restaurant and nightclub) under 11 U.S.C. §§ 363(b) and (f)(the "Sales Motions").[1]  Only the Debtor objected to the Sales Motions.[2]  The Debtor argued that the Trustee had failed to properly conduct due diligence prior to the proposed sales of the assets and, as a result, the Sales Motions should be denied.  Put another way, the Debtor challenged the Trustee's administration of the Debtor's own bankruptcy estate.

Contending that the bankruptcy estate was insolvent and the Debtor had no standing to object to the Sales Motions, the Trustee filed his "Motion to Strike Debtor's Objections to Trustee's Motions to Approve Purchase and Sale Agreements (Stanzi, LLC and Juarez Restaurant, LLC)" (the "Motion to Strike," Docket No. 415).  The Debtor objected.[3]  Apparently wishing to bolster his standing, two weeks after the Motion to Strike was filed, the Debtor obtained an assignment of a purported creditor claim from a law firm: Allen & Mitzner, LLC ("A&M").  A&M assigned its rights *against the Debtor — to the Debtor —* as a "gift."  Subsequently, and based upon the assignment, the Debtor filed a Proof of Claim for $3,274 ("Claim No. 12"), thus placing himself in the unique role of both debtor and purported creditor.  The Debtor contended that his new alleged creditor position conferred standing on him to object to the Trustee's proposed actions.  Responding to the Debtor's new standing gambit, the Trustee submitted an "Objection to Claim No. 12 Filed by Jesse Morreale" (the "Claim Objection," Docket No. 426).  The Debtor contested the Claim Objection.[4]

---

[1] *See* "Motion to Approve Purchase and Sale Agreement Pursuant to 11 U.S.C. §§ 363(b) and (f) (Juarez Restaurant, LLC d/b/a Mezcal)" (Docket No. 368); and "Motion to Approve Purchase and Sale Agreement Pursuant to 11 U.S.C. §§ 363(b) and (f) (Stanzi, LLC d/b/a LaRumba)" (Docket No. 370).

[2] *See* "Debtor's Objection to Trustee's Motion to Approve Purchase and Sale Agreement Pursuant to 11 U.S.C. §§ 363(b) and (f) (Juarez Restaurant, LLC d/b/a Mezcal)" (Docket No. 395); and "Debtor's Objection to Trustee's Motion to Approve Purchase and Sale Agreement Pursuant to 11 U.S.C. §§ 363(b) and (f) (Stanzi, LLC d/b/a LaRumba)" (Docket No. 394).

[3] *See* "Debtor's Objection to Chapter 7 Trustee's Motion to Strike Debtor's Objections to Trustee's Motion to Approve Purchase and Sale Agreements (Stanzi, LLC and Juarez Restaurant, LLC)" (Docket No. 420).

[4] *See* "Response to Trustee's Objection to Claim No. 12 Filed by Jesse Morreale" (Docket No. 445).

Since the Claim Objection and response appeared closely related to the standing issues initially raised in the Motion to Strike and response, the Court consolidated such matters into a single evidentiary hearing. Meanwhile, the Court deferred adjudication of the Trustee's Sales Motions until after the threshold standing issues could be determined.

The Court conducted a hearing on the Motion to Strike, Claim Objection, and responses on May 5, 2015. During the hearing, the Trustee and the Debtor presented testimony and exhibits as well as legal arguments in support of their respective positions. These matters are now ripe for decision.

### A. Jurisdiction.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A), (B), (N) and (O).

### B. Factual Findings.

1. The Bankruptcy Cases.

The Debtor has a long and notable history as an independent businessman engaged in the entertainment and hospitality sectors. For many years, he was a successful concert promoter. About a decade ago, he started opening restaurants, nightclubs, bars, and hotels. His work also involved the development or redevelopment of real estate assets.

The Debtor conducted some of his business activities through a wholly-owned company: Morreale Hotels, LLC ("Morreale Hotels"). In turn, Morreale Hotels owned and operated two buildings in Denver: a property located at 101-115 Broadway Avenue (the "Broadway Property"); and a property located at 3015 E. Colfax Avenue (the "Colfax Property"). Morreale Hotels spent considerable time and resources to revitalize the Broadway Property and Colfax Property but, in doing so, also incurred substantial debt. The Debtor personally guaranteed some of Morreale Hotels' debt.

During 2012, Morreale Hotels became embroiled in disputes with its primary secured lender, 2011-SIP-1 CRE/CADC Venture, LLC ("SIP/CRE"), and with the City and County of Denver. SIP/CRE began foreclosure proceedings against the Broadway Property. As a result of the foreclosure proceedings and other events, on December 14, 2012, Morreale Hotels filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code in the case captioned: *In re Morreale Hotels, LLC*, Case No. 12-35230-TBM (Bankr. D. Colo.).[5]

The Debtor did not immediately initiate his own bankruptcy case. Instead, he continued to manage Morreale Hotels. However, SIP/CRE brought a legal action against the Debtor based upon the Debtor's personal guaranty of certain of the debts of Morreale Hotels. On September 30, 2013, the District Court for the City and County of Denver entered a judgment in favor of SIP/CRE and against the Debtor in the amount of $3,550,257 plus statutory interest at the rate of

---

[5] The foregoing facts concerning Morreale Hotels are based upon Trustee's Exhibit H (Docket No. 196) "Fourth Amended Disclosure Statement to Accompany Restated First Amended Plan of Reorganization Dated April 3, 2013," in *In re Morreale Hotels, LLC*, Case No. 12-35230-TBM (Bankr. D. Colo.).

2

eight percent (8%) per annum.[6] According to the Debtor's testimony, the entry of judgment against him was the "sole factor" leading to his own bankruptcy case. The Debtor filed this individual bankruptcy case on October 15, 2013.

The Debtor initially operated his individual Chapter 11 case as a debtor-in-possession. In compliance with the Bankruptcy Code, the Debtor filed his Statement of Financial Affairs and Schedules on October 29, 2013.[7] At the request of the Debtor, this Court set December 30, 2013, as a bar date for the filing of proofs of claim.[8] The Debtor eventually filed a Plan of Reorganization about a year after the commencement of his own bankruptcy case. On October 31, 2014, the Debtor filed his Disclosure Statement under 11 U.S.C. § 1125.[9]

Meanwhile, the United States Trustee and SIP/CRE both sought conversion. On December 9, 2014, this Court entered an Order converting this case from Chapter 11 to Chapter 7 based upon 11 U.S.C. §§ 1112(b)(4)(A) and (I).[10] The United States Trustee appointed Tom H. Connolly as the Chapter 7 Trustee for this case the next day.[11]

2.      The Facts Concerning Estate Solvency.

In his Summary of Schedules, the Debtor listed assets of $3,623,699 against liabilities of $7,152,069 — thus suggesting an insolvent estate from the start.[12] As set forth above, SIP/CRE had obtained a pre-petition judgment of $3,550,257 (plus interest) against the Debtor.[13] The Debtor also identified a business debt owing to the United States Small Business Administration of $1,561,461.[14] Further, the Debtor listed an undisputed debt of $979,744 owing to U.S. Bank, N.A. for his home mortgage. Just these three debts alone (which together total more than $6,091,462) establish the insolvency of the Debtor's estate.

Until recently (in connection with the Motion to Strike), the Debtor repeatedly confirmed the insolvency of his bankruptcy estate both in the context of a Chapter 11 reorganization and a Chapter 7 liquidation. In his Disclosure Statement, which he filed less than four and a half months before the Motion to Strike, the Debtor engaged in substantially the same exercise now required for standing purposes: a liquidation analysis.

In the text of the Disclosure Statement, the Debtor advised the Court and creditors:

---

[6]     See Trustee's Exhibit K, Order and Judgment and Transcript of Judgment, *2011-SIP-1 CRE/CADC Venture, LLC v. Jesse C. Morreale*, Case No. 2013-CV-30097 (District Court, City and County of Denver, Colorado).
[7]     See Trustee's Exhibit A (Docket No. 17).
[8]     See Trustee's Exhibit C (Docket No. 24).
[9]     See Trustee's Exhibit F (the "Disclosure Statement," Docket No. 246).
[10]    See Docket Nos. 293 and 294.
[11]    See Docket No. 298.
[12]    The Debtor claimed substantial exemptions against the listed assets on Schedule C. Furthermore, most of the liabilities identified on the Debtor's Schedules D and F were listed as disputed by the Debtor. Accordingly, the aggregate listed assets and liabilities are not dispositive for purposes of solvency analysis.
[13]    The Debtor listed the SIP/CRE liability as "disputed." However, the debt is based on a judgment. The Debtor has provided no evidence suggesting that the claim should be disallowed.
[14]    The Debtor listed the United States Small Business Administration liability as "disputed." However, the Debtor has provided no evidence suggesting that the claim should be disallowed.

3

> COMPARISON OF PLAN TO LIQUIDATION UNDER CHAPTER 7 OF THE BANKRUPTCY CODE: The Debtor projects that under his Plan, the Debtor's general unsecured creditors… in Class 6 will realize a return of 100% of their allowed unsecured claims, and Class 7 will realize a return of 43.6% of their allowed unsecured claims, with interest. *The Debtor estimates that liquidation under Chapter 7 of the Bankruptcy Code would result in a payment of 38.2% to general unsecured creditors….* A liquidation analysis under Chapter 7 is attached hereto…. *The Debtor believes that there would be sufficient Assets to pay Chapter 7 administrative expenses and allowed Chapter 11 administrative expenses in full, but not allowed unsecured claims.*[15]

The Debtor touted his Plan of Reorganization as better than a Chapter 7 liquidation which would not pay unsecured creditors in full. The Debtor signed the Disclosure Statement.

The Debtor also attached a Liquidation Analysis to the Disclosure Statement. The Liquidation Analysis lists assets of only $1,052,347. This amount is less than the amount on the Debtor's initial Summary of Schedules. The Debtor explained that one of the assets was "discounted in Chapter 7 liquidation for costs of sale and quick sale discount." This discount seems appropriate since asset values frequently are not fully realized in liquidation. The Liquidation Analysis also lists estimated Chapter 11 administrative expenses of $175,000 and estimated Chapter 7 administrative expenses of $75,000. The literal bottom line of the Liquidation Analysis is quite clear: "Estimated Chapter 7 Distribution to Unsecured Creditors: 38.2%."

Even this Liquidation Analysis, which was presented by the Debtor to estimate returns to creditors in a Chapter 7 liquidation, seems optimistic. This is because the Debtor ignored his single biggest liability: the SIP/CRE judgment claim. SIP/CRE filed a proof of claim in this case for $3,567,376 (plus interest).[16] But the Disclosure Statement and Liquidation Analysis sidestep this liability and suggest that it will be satisfied in the Morreale Hotels bankruptcy case instead. Several other debts filed against the Debtor in this case by the City and County of Denver (one claim for $307,254 and another for $66,300) also were not accounted for in the Liquidation Analysis. Moreover, the Liquidation Analysis appears to acknowledge only $1,908,269 of other unsecured claims and presumes that other filed claims would be disallowed.

But, if the Court were to accept as true everything in the Debtor's own Liquidation Analysis, the Liquidation Analysis shows liabilities totaling $2,178,010[17] against assets totaling $1,052,347, as of October 31, 2014. Thus, the Debtor's bankruptcy estate clearly was insolvent by the Debtor's own admission.

Now that solvency is at issue for purposes of his legal standing, the Debtor has asserted different numbers. The Debtor did not offer any new appraisals or valuations. Instead, the

---

[15] *See* Trustee's Exhibit F at 45 (emphasis added).
[16] *See* Trustee's Exhibit K.
[17] This calculation is based on adding the following: Secured Claims ($50,403); Chapter 7 Administrative Expenses ($75,000); Chapter 11 Administrative Expenses ($175,000); IRS Priority ($53,302); and Unsecured Claims ($1,824,305) (which presupposes a payment of 4% in the Morreale Hotels case).

4

principal evidence of the purported value increase was from the Debtor and also the Debtor's characterization of events in the bankruptcy case. Early in his testimony on May 5, 2015, the Debtor stated that the liquidation value of his assets is "about $2 million" — in other words, about double the asset values reported on October 31, 2014. A bit later, the number rose to "between $2 and $2.4 million." The Court finds that the Debtor did not offer a satisfactory explanation for the differences between asset values that the Debtor advanced in the Liquidation Analysis and the new figures of "about $2 million" and "between $2 and $2.4 million" now suggested. The Court does not credit the Debtor's "lot of moving parts" rationale. The Debtor's testimony regarding asset values lacked credibility, was not corroborated, and appeared based upon uncertain assumptions.

In respect to the Debtor's liabilities, the Liquidation Analysis asserted liabilities of $2,178,010 even though such number ignored the SIP/CRE claim and other liabilities. Now, the Debtor suggests less debt and testified that, "assuming nothing is paid out through [Morreale] Hotels, and absent [the] mortgage on [the Debtor's] personal residence," the total amount of claims is "$1.9, 1.8 [million]."

However, the proofs of claim filed against the Debtor belie the Debtor's position and are as follows[18]:

| | |
|---|---|
| City and County of Denver | $ 15,685 |
| Internal Revenue Service | $ 92,521 |
| GE Capital Retail Bank | $ 2,500 |
| City and County of Denver | $ 288,366 |
| City and County of Denver | $ 307,254 |
| City and County of Denver | $ 66,300 |
| 2011-SIP-1 CRE/CADC Venture LLC | $3,567,376 |
| Colorado Lending Source | $1,618,056 |
| United States Trustee | $ 1,300 |
| J.R. Harris & Co. | $ 78,368 |
| Jesse Morreale | $ 3,274 |

Thus, the total of filed claims is: $6,041,000. Against this backdrop, the Debtor offered testimony about the alleged invalidity of some of the claims. For example, the Debtor stated that the J.R. Harris & Co. claim of $78,368 was a business debt of Morreale Hotels, not a debt against his estate. The Debtor testified, without supporting documents, that the $66,300 claim of the City and County of Denver was "paid off about a year and a half ago." And he indicated that the $15,685 claim of the City and County of Denver should be only $3,000. But even crediting this testimony (which would result in a $157,353 reduction) does not change the bottom line: the claims would still be well in excess of $5,800,000, not including Chapter 11 and Chapter 7 administrative fees and taxes. The Debtor acknowledged that the Chapter 11 administrative expenses of his counsel alone total "about $200,000, $250,000 maybe."

Since the Debtor did not offer any other witnesses regarding solvency, the only other evidence came from the Trustee. The Trustee testified repeatedly and consistently under direct and cross examination that "there's no potential surplus" and "there is just no chance that I will be able

---

[18] *See* Trustee's <u>Exhibit G</u> Claims Register (not including a $0 claim and a duplicate claim).

5

to pay these creditors in full as this case is going. I wish I could." The Court finds that the Trustee's testimony was credible and convincing.

Regarding liabilities, the Trustee noted that the combined claims of the City and County of Denver (Office of Economic Development) and Colorado Lending Source (Small Business Administration) both "are probably going to be allowed" and together total more than $2.2 million. This alone would exceed the optimistic new testimony of the Debtor regarding total asset values. The Trustee estimated trustee's compensation under 11 U.S.C. § 326 at $75,000 and legal expenses already incurred in the Chapter 7 at $40,000; neither of which is included in the Claims Register.

During the examination of the Trustee, the Debtor's counsel repeatedly focused on a document titled: "Analysis of Claims in Samuel Jesse Christian Morreale, 13-27310 (Chapter 7)" (the "Analysis").[19] The Debtor appeared to argue that the Analysis was an admission by the Trustee that showed that the Debtor's bankruptcy estate was solvent. The Court does not agree with the Debtor's characterization of the Analysis. The Analysis was appended to a motion in the Morreale Hotels bankruptcy case. (Docket No. 661.) The motion stated:

> Even in the light most favorable to Mr. Morreale, his personal Chapter 7 estate is insolvent. To demonstrate this, attached hereto is [the Analysis] which shows the Chapter 7 estate's liabilities and assets under the "best case scenario" for Mr. Morreale. The Trustee does not necessarily agree with the claim amounts and values listed…, but believes that such chart demonstrates that, even in the light most favorable to Mr. Morreale, the Chapter 7 estate is insolvent…. [I]t does not take into account Chapter 7 fees and costs for the Trustee and any professionals the Trustee may employ or other costs of sale or tax consequences.

The Trustee's testimony at the hearing about the Analysis was very much the same. The Trustee stated: "What this document states is that if a whole series of improbable acts or events occurred, even if all of them occurred, the Chapter 7 estate would still be insolvent." The Analysis itself states total claim amounts "in the light most favorable to Mr. Morreale." The Court views the Analysis the same way — as an improbable listing of some claims and assets in the light most favorable to the Debtor — but which still shows the Debtor's estate to be insolvent (claims of $2,043,931 against assets of $1,765,272, with a resulting deficit of $278,659).

3. <u>The Facts Concerning Claim No. 12</u>.

The Debtor recently acquired a claim *against himself*. On March 30, 2015 (after the Motion to Strike was filed), the Debtor filed a Proof of Claim in this case for $3,274 (Claim No. 12).[20] Claim No. 12 stated that the amount was owed for a "Business debt" and appended an Assignment of Claim (the "Assignment"), dated March 26, 2015. The Assignment states that A&M assigned to the Debtor "all of its right, title, and interest in that certain Claim in the amount

---

[19] *See* Debtor's <u>Exhibit 4</u>.
[20] *See* Trustee's <u>Exhibit D</u>.

6

of $3,274.40…. and any right to file a proof of claim." No supporting documents were attached to Claim No. 12. However, during the hearing, the Debtor introduced into evidence a copy of an invoice from A&M for legal services and costs in the amount of $3,272.[21]

The Debtor originally listed A&M as a creditor holding a claim of $3,274 on his Schedule F.[22] The Debtor characterized the A&M Claim as a "Business debt," without identifying any particular business to which it was attributable. Moreover, the Debtor checked the boxes on the Schedule F for: "CODEBTOR," "CONTINGENT," "UNLIQUIDATED," and "DISPUTED." The Debtor's Schedule H identified Morreale Hotels as the codebtor on the A&M Claim.

Morreale Hotels also listed the A&M Claim on its Schedules.[23] Morreale Hotels characterized the A&M Claim as a "Trade debt" in the amount of $3,274. Unlike in this case, Morreale Hotels did not list a "codebtor" for the A&M Claim and did not contest it as "contingent, unliquidated or disputed."

Regarding the underlying A&M Claim, since it was listed as contingent, unliquidated and disputed in this case by the Debtor, A&M was required to file a proof of claim by the December 30, 2013 bar date[24] if it wished to assert the claim while this case was in Chapter 11. A&M did not file a proof of claim prior to conversion.[25] Further, A&M took no action in this case.

In any event, after the conversion to Chapter 7, the Debtor again analyzed the A&M Claim on a document labeled: "Claims Comparison between Morreale Hotels and Personal Case" (the "Claims Comparison").[26] The Claims Comparison is dated March 21, 2015, and was filed with the Court on March 26, 2015. In the Claims Comparison, the Debtor did not include the A&M Claim as a valid claim against the Debtor in this "personal" case. Instead, the Debtor identified the A&M Claim as a "CLAIM[] IN HOTELS CASE ONLY" for $3,274. The Claims Comparison showed no debt owed to A&M in this case. The Claims Comparison also stated: "Those same 3 creditors [not including A&M] are the only creditors with valid cross-claims between the two cases, so why not resolve them through Hotel's case before liquidating my estate?"

Thus, until March 26, 2015, the Debtor himself repeatedly disclaimed that he owed any debt individually to A&M in this case. It was not until he received the Assignment that the Debtor's position changed. Thereafter, the Debtor alleged that the A&M Claim was a valid personal obligation of the Debtor. Both the Debtor and Robert Allman (a lawyer with A&M) confirmed that the Assignment was given to the Debtor for no monetary consideration. Mr. Allman characterized the Assignment as follows: "I like him [the Debtor]. I felt sorry for him. I had sympathy. I guess I considered it a gift of some sort."

Both Robert Allman and the Debtor testified concerning whether the legal services were provided to the Debtor or Morreale Hotels. Mr. Allman considered "Mr. Morreale to be the

---

[21] *See* Debtor's Exhibit 1.
[22] *See* Trustee's Exhibit A.
[23] *See* Trustee's Exhibit B.
[24] *See* Trustee's Exhibit C.
[25] The Court assumes, without deciding, that Claim No. 12 was timely-filed after the conversion to Chapter 7.
[26] *See* Debtor's Exhibit 3.

7

obligor on the bill although secondarily his entity [Morreale Hotels]." The Debtor testified as follows:

> Q: Who do you think was responsible for the fees that were incurred for Mr. Allman?
>
> A: I think both the company [Morreale Hotels] and myself, primarily me, because I owned the company so that makes it my responsibility.
>
> Q: Was Mr. Allman providing services to both Hotels and to you personally in your opinion?
>
> A. To a degree.

The Court finds the testimony somewhat revisionary and self-serving in light of prior characterizations by the Debtor.

In any event, very few of the services on the A&M invoice appear related to the Debtor individually. With only one exception, all of the services focused on a foreclosure proceeding against real estate owned by Morreale Hotels in which the Debtor was not a party. Only a portion of one time entry seems directed to the Debtor's personal issues as a guarantor: "consider use of bankruptcy to obtain rights protection and defenses available to guarantor."

All of the services were rendered between October 2, 2012 and November 15, 2012. The services stopped just before Morreale Hotels filed for bankruptcy protection. The Debtor did not file for bankruptcy himself until almost a year later. The Debtor testified that he "always" paid his personal debts as they became due until his bankruptcy filing. But the Debtor failed to pay A&M. The fact that the Debtor did not pay A&M prior to filing for bankruptcy appears to be consistent with the Debtor's prior characterizations of the obligation as owed by Morreale Hotels, not by himself personally.

The Court finds that the time entries on the A&M invoice, the timing of the services (which ended when Morreale Hotels filed for bankruptcy), the failure of the Debtor to pay the invoice for almost a year, and the Debtor's prior characterizations of the obligation as owing only by Morreale Hotels all dictate that the vast majority of the underlying services (if not all of the services) were provided for the benefit of Morreale Hotels, not the Debtor individually. The Court also finds, based on the timing of the Assignment and the Debtor's own testimony, that the Assignment was engineered primarily for the Debtor to attempt to obtain standing in this case.[27]

---

[27] The Debtor offered no other purpose for the Assignment. The Trustee's counsel asked the Debtor: "we all know you acquired the claim in order so that you could get standing in this case, isn't that right?" The Debtor responded: "I think that there's more than one reason and a lot of the things that I've done in both of these cases has been upon the advice and direction of counsel."

C. *Legal Analysis and Conclusions of Law*.

1. *The Debtor Does Not Have Standing to Object to the Sales Motions*.

   a. *The Debtor Bears the Burden of Proving Standing*.

Standing is "a threshold issue in every federal case." *Thomas v. Fed. Nat'l Mortg. Assoc. (In re Thomas)*, 469 B.R. 915, 921 (10th Cir. BAP 2012). The party asserting standing bears the burden of proving standing. *Thomas*, 469 B.R. at 921; *Lewis v. McCallum (In re Lewis)*, 378 B.R. 418 (Table), 2007 WL 2189343 (10th Cir. BAP 2007) (unpublished); *Ebel v. King (In re Ebel)*, 338 B.R. 862, 869 (Bankr. D. Colo. 2005) ("Once the issue of standing was controverted by the Trustee, the burden was on [the party asserting standing] to offer evidence at trial that would demonstrate his standing."); *B&P Baird Holdings, Inc. v. Boyd (In re B&P Baird Holdings, Inc.)*, 2012 WL 4501016 * 3 (W.D. Mich. 2012) (debtor bore the burden of proving standing with evidence).

   b. *The Debtor Failed to Meet His Burden to Prove a Reasonable Possibility of a Surplus in this Case*.

Prudential bankruptcy standing "is narrower than Article III standing." *Cult Awareness Network, Inc. v. Martino (In re Cult Awareness Network, Inc.)*, 151 F.3d 605, 607 (7th Cir. 1998). "To have standing to object to a bankruptcy court order, a person must have a pecuniary interest in the outcome of the bankruptcy proceedings. Only those persons affected pecuniarily by a bankruptcy court order have standing to appeal that order." *Id. See also In re Brutsche*, 500 B.R. 62, 72 (Bankr. D.N.M. 2013) ("To have standing, a debtor must have a financial interest in the outcome…").

A Chapter 7 debtor only very rarely has a pecuniary interest in matters affecting administration of the bankruptcy liquidation, such as motions to sell property and settlement of claims. *In re Bugaighis*, 2004 WL 3190352 (Bankr. D. Colo. 2004). This is because in almost all Chapter 7 cases, "no matter how the estate's assets are disbursed by the trustee, no assets will revert to the debtor." *Cult Awareness*, 151 F.3d at 607; *see also* 11 U.S.C. § 726 (providing the priorities for distributions in a Chapter 7 liquidation). Nevertheless,

> [t]here is an established 'exception' to the rule that debtors do not have standing to object to bankruptcy orders, which is not so much an exception as a careful application of the pecuniary interest rule itself. Occasionally a debtor might be able to satisfy all debts with assets from the estate and be left with some amount remaining. *If the debtor can show a reasonable possibility of a surplus after satisfying all debts, then the debtor has shown a pecuniary interest and has standing to object to a bankruptcy order.*

*Cult Awareness*, 151 F.3d at 608 (emphasis added) (citing, *In re Andreuccetti*, 975 F.2d 413, 416 (7th Cir. 1992)). *See also In re 60 E. 80th St. Equities, Inc.*, 218 F.3d 109, 115 (2nd Cir. 2000)

9

("reasonable possibility of a surplus" rule applies in the context of motions to sell estate property by Chapter 7 trustee).[28]

In order to demonstrate a pecuniary interest sufficient for purposes of standing, "the debtor must offer some evidence that a surplus may result, not just that there is a *theoretical* chance of a surplus." *Brutsche*, 500 B.R. at 72. Put another way, the likelihood of a surplus cannot be merely speculative. A "surplus is highly unlikely in a liquidation proceeding, and standing based on a potential surplus is unlikely to succeed." *In re Manshul Constr. Co.*, 223 B.R. 428, 430 (Bankr. S.D.N.Y. 1998).

The "reasonable possibility of a surplus" rule has been universally endorsed and is the law in the Tenth Circuit with respect to bankruptcy appeals. *Co-op Mining Co. v. Aquila, Inc. (In re Matter of C.W. Mining Co.)*, 636 F.3d 1257, 1260 (10th Cir. 2011); *Weston*, 18 F.3d at 863-64; *Kopp v. Clark (In re Kopexa Realty Venture Co.)*, 240 B.R. 63, 66 (10th Cir. BAP 1999).

In this case, both the Trustee and the Debtor agree on the legal standard. However, they disagree on the facts. The Court starts its analysis with the Debtor's Schedules.

The Debtor's Summary of Schedules listed assets of $3,623,699 against liabilities of $7,152,069. "Statements in bankruptcy schedules are executed under penalty of perjury and when offered against a debtor are eligible for treatment as judicial admissions. A debtor may not adopt a cavalier attitude toward the accuracy of his schedules by arguing that they are not precise and correct." *In re Bohrer*, 266 B.R. 200, 201 (N.D. Cal. 2001). S*ee also Sorvan Bank, N.A. v. Anderson*, 743 F.2d 223, 225 (4th Cir. 1984) ("the Schedules have not been corrected and are binding"); *Keen v. First Sentinel Bank (In re Keen)*, 2014 WL 6871867 (Bankr. W.D. Va. 2014) ("it is well-established that statements contained in the schedules of a bankruptcy debtor can constitute binding admissions of the factual matters set forth in the schedules"). Although the Court does not find that the Schedules are alone dispositive (because the Debtor listed many of the debts as disputed and assets as exempt), the Debtor's Schedules establish an evidentiary base-line pointing toward insolvency.

Further, as discussed above, the admissions in the Debtor's Disclosure Statement and accompanying Liquidation Analysis (filed just four and a half months before the Motion to Strike) demonstrate that the Debtor's estate is nowhere near solvency. The Debtor projected that a Chapter 7 liquidation would pay general unsecured creditors only 38.2% of their claims which would leave nothing for the Debtor. In the Liquidation Analysis, the Debtor listed assets of $1,052,347 and liabilities of $2,178,010. The Court finds the Debtor's representations made in the Disclosure Statement and Liquidation Analysis, which were presented to inform creditors and the Court regarding the viability of the Debtor's proposed Plan of Reorganization, are judicial admissions or, at least, evidentiary admissions.

The Court also considered the claims filed in this case which total $6,041,000. This amount is far in excess of the Debtor's projected asset values. The SIP/CRE proof of claim alone

---

[28] In addition to the "reasonable possibility of a surplus" test, *Weston v. Mann (In re Weston)*, 18 F.3d 860, 863 (10th Cir. 1994), notes that standing may be available for a Chapter 7 debtor if the matter "involves rights unique to the debtor." The Debtor in this case has not argued that the Sales Motions involve rights unique to the Debtor. Thus, only the "reasonable possibility of a surplus" standard is at issue.

is $3,567,376 (plus interest). It is based upon a judgment and does not appear subject to genuine dispute. Colorado Lending Source filed a claim for $1,618,056 which also does not appear subject to true dispute. These significant claims alone dictate insolvency in this case. However, the Debtor has essentially ignored the SIP/CRE proof of claim in its assessment of possible surplus, apparently hoping that the claim will be paid in the Morreale Hotels bankruptcy case. The Debtor's Claims Comparison also appears to suggest that all but $38,235 of Colorado Lending Source's $1,618,056 claim should be paid by Morreale Hotels, not the Debtor. The Court does not believe that such claims can be ignored as individual obligations of the Debtor in this case for purposes of solvency analysis.

In his opposition to the Motion to Strike, the Debtor argued that a plan of reorganization would be filed and confirmed in the Morreale Hotels bankruptcy case (the "Hotels Plan") which would satisfy the claims of "nearly all of the creditors of this Debtor." It was on this basis that the Debtor argued that a "reasonable possibility of a surplus existed." At the hearing in this matter, the Debtor abandoned the argument and conceded that the Hotels Plan (which had been previously rejected by this Court) was "perhaps too attenuated to constitute a reasonably possibility [of a surplus] so we focused today on what in fact the Chapter 7 Trustee has proposed [in the Morreale Hotels bankruptcy case]."

The Court agrees that the unsuccessful Hotels Plan is not a sufficient basis to show a "reasonable possibility of a surplus" in this case. The Debtor also did not establish that "what in fact the Chapter 7 Trustee has proposed" in the Morreale Hotels case would result in solvency in this case either. The Debtor appeared to focus on a proposed 11 U.S.C. § 363 sales motion in the Morreale Hotels case (the "Hotels Sales Motion"). But the Debtor readily concedes that he has opposed the Hotels Sales Motion and testified that "it's an abomination." Other parties also have opposed the Hotels Sales Motion. The Court has deferred decision on the Hotels Sales Motion pending resolution of various threshold issues including standing. Even if the Hotels Sales Motion were approved, though, the Debtor did not offer any concrete evidence of whether or not SIP/CRE would have a deficiency nor the possible impact of such deficiency in this case. When asked about his understanding of the impact of the Hotels Sales Motion, the Debtor offered that "[n]o unsecured creditors would be paid through the Hotels case." If true, which the Trustee disputed, it suggests that this case will remain insolvent. Regardless, the Debtor offered mere speculation and hope of future success in the Morreale Hotels case as grounds for a surplus in this case. Such testimony fails to satisfy the Debtor's evidentiary burden.

Regarding the Debtor's credibility, the Court does not suggest that the Debtor was lying or engaged in misconduct. Instead, it is apparent that the Debtor has a strongly-held belief that he should be managing both this case and the Morreale Hotels bankruptcy case. Further, the Debtor seems to believe sincerely that with time, effort and good fortune all creditors may be paid in full. However, the Court does not find such testimony credible. It is speculative and without sufficient evidentiary foundation to establish a "reasonable possibility of a surplus," especially in light of the evidence to the contrary. This case is now in liquidation despite the Debtor's very clear wishes to the contrary. In a Chapter 7 liquidation, the Chapter 7 trustee is required to "collect and reduce to money [*i.e.* liquidate] the property of the estate." 11 U.S.C. § 704(a)(1). This is precisely what the Trustee seeks to do.

11

In sum, the Court finds that the Debtor confirmed that the Debtor's estate was insolvent in the October 31, 2014 Liquidation Analysis. The Debtor's testimony to the contrary now is not credible. Relying on the Statements and Schedules, the Disclosure Statement, the Liquidation Analysis, the Claims Register, the SIP/CRE Claim, and the testimony of the Trustee, the Court finds that the Debtor did not meet his burden of proving a "reasonable possibility of a surplus" (after payment in full to creditors) in this liquidation case.

  c. <u>The Debtor's Claim No. 12 Does Not Establish Standing</u>.

Almost certainly because he recognized the difficulty of establishing solvency and standing in this case, the Debtor sought to buttress his position by acquiring the A&M Claim. The Assignment is dated March 26, 2015, which is after the Motion to Strike was filed. The Assignment was given as "a gift of some sort" by A&M to the Debtor. The timing and the Debtor's own testimony establish that the Assignment was secured primarily, if not exclusively, for the Debtor to attempt to obtain standing in this case. Thereafter, the Debtor argued that he is a creditor in this case and "unquestionably has standing" to object to the Trustee's sales motions. Having received the Assignment, the Debtor filed Claim No. 12 on March 30, 2015.

The Court finds that acquisition of the A&M Claim and filing Claim No. 12 do not confer standing on the Debtor. As set forth below, the Court has determined that the Debtor failed to meet his burden to prove the validity and amount of Claim No. 12. Accordingly, Claim No. 12 is disallowed. The Court also has decided that the Debtor may not assert a claim against himself. Given these determinations, Claim No. 12 provides no basis for the Debtor to assert standing to object to the Sales Motions.

2. <u>Claim No. 12, filed by the Debtor against the Debtor,[29] Is Disallowed</u>.

  a. <u>The Debtor Bears the Burden of Proof</u>.

Fed. R. Bankr. P. 3001(c) mandates that "when a claim… is based on a writing, a copy of the writing shall be filed with the proof of claim." Official Form 10 Proof of Claim confirms this requirement of attaching supporting documents "such as promissory notes, purchase orders, [and] invoices…." *See also* Fed. R. Bankr. P. 3001(a) (requiring that a "proof of claim shall conform substantially to the appropriate Official Form"). Claims filed in compliance with the foregoing Rules "shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f).

In this case, the Debtor did not attach the A&M invoice or any other supporting documents to Claim No. 12. The Debtor only attached the Assignment (which did not provide any support for the underlying validity of the asserted claim). As a result, the Debtor is not entitled to any favorable prima facie evidentiary presumption under Fed. R. Bankr. P. 3001(f). Instead, the Debtor (as the purported claimant) bears the burden of proving both the validity and amount of Claim No. 12. *Caplan v. B-Line, LLC (In re Kirkland)*, 572 F.3d 838, 840 (10th Cir. 2009).

---

[29] The Debtor purports to be a creditor. 11 U.S.C. § 101(10) defines the term "creditor" as an "entity that has a claim *against the debtor*" (emphasis added). Thus, the Debtor purports to have a claim against himself.

  b. <u>The Debtor Failed to Meet His Burden to Prove the Validity and Amount of Claim No. 12</u>.

  The Debtor originally listed the A&M Claim (which is the basis of Claim No. 12), as a *disputed "Business debt"* on his Schedule F. The Debtor's Schedule H identified Morreale Hotels as a codebtor on the A&M Claim. In turn, Morreale Hotels characterized the A&M Claim as an *undisputed "Trade debt."* Both his own Schedules and the Schedules of Morreale Hotels were signed by the Debtor under penalty of perjury.

  The juxtaposition of the treatment of the A&M Claim on the Schedule F in the Debtor's individual bankruptcy case and the Schedule F in the Morreale Hotels bankruptcy case is revealing. Taken together, the clear implication is that the A&M Claim is valid against Morreale Hotels; but not against the Debtor individually. After all, the Debtor listed the A&M Claim as a "Business debt." Furthermore, as against himself, he characterized the A&M Claim as disputed. In other words, the Debtor contested the A&M Claim as against himself, but acknowledged that it was an obligation of the business debtor: Morreale Hotels.

  The Court believes that the Debtor's characterizations of the A&M Claim in his own Schedules and in the Schedules of his wholly-owned business entity, Morreale Hotels, are important. *Bohrer*, 266 B.R. at 201; *Sorvan Bank,* 743 F.2d 223, 225 ("the Schedules have not been corrected and are binding"). In this case, the Debtor admitted in his Schedule F that he disputed the A&M Claim. He is bound by such admission and may not now assert that the very same A&M Claim is valid.

  The Debtor also repeatedly disclaimed the validity of the A&M Claim as a personal obligation through his actions and other judicial submissions. For example, the A&M invoice was for services rendered between October 2, 2012 and November 15, 2012. The Debtor testified that he "always" paid his personal obligations prior to his bankruptcy filing. But for almost a year (from November 15, 2012 to the petition date in this case), the Debtor did not pay A&M for the legal services. Given the testimony about the Debtor "always" paying his personal creditors, and A&M not being paid by the Debtor, the Court concludes that the Debtor himself did not really believe that the A&M invoice was a personal obligation. The Debtor confirmed as much in his Claims Comparison, dated March 21, 2015. In that document, he characterized the A&M Claim as a "CLAIM[] IN HOTELS CASE ONLY" and disclaimed any valid "cross-claim" between the Debtor's personal bankruptcy case and the Morreale Hotels bankruptcy case. Given that the Debtor presented the Claims Comparison to the Court on March 26, 2015, the Court believes that the Debtor's characterization of the A&M Claim constitutes a further judicial admission (or at least an evidentiary admission) consistent with the Debtor's Schedules and prior conduct.

  The Debtor presented the A&M invoice at the hearing to support his assertion that the legal services were rendered to him personally. However, as set forth above, the A&M invoice primarily shows the opposite. All, or virtually all, of the other billing entries relate to a foreclosure proceeding brought against real estate owned by Morreale Hotels, not the Debtor. Moreover, the A&M invoice establishes that A&M ceased legal services on November 15, 2012, just a month before Morreale Hotels filed for bankruptcy. The Debtor did not file for bankruptcy until almost a year later; but A&M apparently did not provide any further services after the Morreale Hotels

filing. The timing provides a further inference that A&M was providing legal services to Morreale Hotels, not the Debtor.

The Debtor and Robert Allman (a lawyer with A&M) provided some testimony in support of Claim No. 12 during the May 5, 2015 hearing. Despite the prior history, the Debtor contended that the A&M invoice was valid and his personal obligation. Mr. Allman was more nuanced and suggested that the Debtor was the primary obligor for the legal services and that Morreale Hotels was only secondarily responsible. The Court has considered this testimony but finds it equivocal. Further, the testimony conflicts with the Debtor's Schedules, the Debtor's actions, and the Claims Comparison.

After considering the foregoing, the Court concludes that the Debtor has failed to meet his burden to prove the validity and amount of Claim No. 12. Accordingly, Claim No. 12 will be disallowed in this case.

      c.      <u>The Debtor May Not Assert a Claim Against Himself</u>.

Even if the A&M Claim were a valid obligation owed personally by the Debtor, the Court believes that the Debtor may not assert Claim No. 12 *against himself*. In other words, the Assignment is impermissible as a matter of law under the very peculiar circumstances of this case.

Certainly, as a general matter, no particular formality is required for a valid assignment in Colorado. *Lookout Mountain Paradise Hills Homeowners' Assoc. v. Viewpoint Assoc.*, 867 P.2d 70, 73 (Colo. App. 1994). Instead, intent to assign is the critical inquiry. Intent may be reflected in a written instrument or inferred by acts or conduct. *Id.* Furthermore, although there does not appear to be any Colorado law directly on point, the Court concludes that a valid assignment may be made on a gratuitous basis — as a gift. *See Restatement (Second of Contracts)* § 322(1) (1981); *Lansing v. Concrete Design Specialties, Inc.*, 2006 WL 1229638 (Minn. App. 2006) ("Assignments may be gratuitous or for value.").

If a valid assignment of a claim is made, "the assignee is the real party in interest." *Hoeppner Construction Co. v. United States,* 287 F.2d 108, 111 (10th Cir. 1961); *see also Adams v. Thomas (In re Thomas)*, 387 B.R. 808, 812 (D. Colo. 2008) (Colorado law generally "recognizes the transferability of a chose in action."). This is also consistent with the Bankruptcy Code which directs that: "If a claim has been transferred… before a proof of claim has been filed, the proof of claim may be filed only by the transferee…" Fed. R. Bankr. P. 3001(e)(1).

At first blush, the Assignment from A&M to the Debtor appears to be facially valid. The Assignment was made in writing. It clearly evidences the parties' intention to transfer the A&M Claim to the Debtor. That the Assignment was made for no consideration —as a gift — is interesting, but of no real legal moment since gratuitous assignments may be valid.

But the rub here is that the Assignment was of a claim *against the Debtor — to the Debtor*. After the receipt of the Assignment, the Debtor filed Claim No. 12, which the Debtor now claims against himself. How can this be? The proposition seems nonsensical.

Suppose a debtor purported to loan himself $100 pre-petition and announced: "Self, here is $100." The debtor documented the loan to himself with a promissory note promising to pay himself $100. Thereafter, the debtor filed for bankruptcy protection and then filed a $100 claim against himself based upon the promissory note he executed to himself. The debtor's claim would be summarily rejected since a debtor cannot owe himself money. The circumstances in this case are similar.

The Bankruptcy Code does not, expressly or implicitly, contemplate that a debtor may also be a creditor against himself. The term "debtor" means "person… concerning which a case under this title has been commenced." 11 U.S.C. § 101(13). "Creditor" is something different: an "entity that has a claim *against the debtor* that arose as the time of or before the order for relief concerning the debtor." 11 U.S.C. § 101(10)(A) (emphasis added).[30] The Bankruptcy Code nowhere refers to a "debtor-creditor" or "creditor-debtor." The Court has located no legislative history suggesting that a debtor may also become a creditor in his own case. Similarly, there does not to appear to be any reported case precedent allowing the debtor to assert a claim against himself in bankruptcy, for purposes of standing or otherwise.

Outside of bankruptcy, the rule against self-litigation is more well-established. Many decades ago, the United States Supreme Court confirmed the "long-recognized general principle that no person may sue himself." *U.S. v. I.C.C.*, 337 U.S. 426, 430 (1949). Claims against oneself do not create justiciable controversies. State law generally is similar. *See Lodi v. Lodi*, 219 Cal. Rptr. 117 (Cal. App. 1985) (affirming dismissal of complaint in which "plaintiff Oreste Lodi sued himself" on basis of failure to state a cognizable claim).

The Court determines that a debtor cannot owe himself money or sue himself. This principle is both a legal truism and a matter of common sense. *See Live Oak Pub. Co. v. Cohagan*, 86 Cal. Rptr. 198, 203 (Cal. App. 1991) ("It is self-axiomatic that a person cannot sue himself or herself."). But that is effectively what the Debtor is trying to do in this case. By purporting to acquire the A&M Claim by Assignment, the Debtor then asserted it against himself as Claim No. 12 and is demanding that Claim No. 12 be allowed and paid along with other claims by the Trustee.

Although this maneuver represents some creative lawyering, it is not permissible or effective. The Court concludes that Claim No. 12 cannot be allowed because it has been acquired by the Debtor. Instead, when the Debtor acquired the A&M Claim, the acquisition operated to release, extinguish, or nullify Claim No. 12 entirely.

---

[30]   11 U.S.C. § 101(10)(B) also includes as a "creditor" an "entity that has a claim against the estate" based upon certain limited post-petition events.

D. <u>Decision</u>.

The Court ORDERS that:

The Trustee's Motion to Strike is GRANTED; and

The Trustee's Claim Objection is GRANTED. Claim No. 12 is disallowed.

DATED this 28th day of May, 2015.

BY THE COURT:

*Thomas B. McNamara*

Thomas B. McNamara
United States Bankruptcy Judge