## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF COLORADO
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>SAMUEL JESSE CHRISTIAN MORREALE,<br><br>Debtor. | Bankruptcy Case No. 13-27310 TBM<br>Chapter 7 |

---

## MEMORANDUM ORDER AND OPINION ON BROWNSTEIN HYATT FARBER SCHRECK, LLP'S FINAL APPLICATION FOR PROFESSIONAL COMPENSATION

---

### I.     Introduction.

The Debtor, Samuel Jesse Christian Morreale (the "Debtor"), started this bankruptcy drama eight years ago.  A businessman who focused on the hospitality industry, he owned and managed restaurants, nightclubs, bars, and hotels through a myriad of corporate vehicles, including Morreale Hotels, LLC ("Morreale Hotels").  Morreale Hotels owned two commercial buildings the Debtor hoped to redevelop.  The Debtor guaranteed most of the debt of the entity.  When Morreale Hotels defaulted, one of its lenders started foreclosure proceedings.  In 2012, the Debtor responded by placing Morreale Hotels into Chapter 11 bankruptcy in the case captioned:  *In re Morreale Hotels, LLC*, Case No. 12-35230 TBM (Bankr. D. Colo.) (the "*Morreale Hotels* Case").  With the foreclosure stymied, the lender sued the Debtor on his guaranty and obtained a multi-million dollar judgment against him.  So, in 2013, the Debtor started his own parallel Chapter 11 bankruptcy: *In re Morreale,* Case No. 13-27310 TBM (Bankr. D. Colo.) (the "Individual Case").  To say that the two bankruptcy cases were substantially intertwined understates the extremely close relationship between them.  Virtually everything that happened in the *Morreale Hotels* case had an impact on the Debtor's Individual Case — and vice versa.

Neither of the bankruptcy cases went well with the Debtor playing the leading role.  In the first two years of the *Morreale Hotels* Case, the entity failed to confirm a plan of reorganization, creditors received nothing, and the case devolved into internecine litigation warfare.  Similarly, in his Individual Case, the Debtor was at loggerheads with his creditors and did not confirm a reorganization plan.  All along, the Debtor claimed that he and Morreale Hotels were so insolvent that creditors could expect only a low return.  Progress in the two bankruptcy cases effectively stalled.  In 2014, at the request of both the United States Trustee (the "UST") and the largest

creditor in both bankruptcy cases, the Court converted the Debtor's Individual Case to liquidation under Chapter 7.  Enter Tom Connolly, who was appointed as the Chapter 7 Trustee (the "Trustee").

The Trustee took control of the Debtor's property including the Debtor's equity interests in Morreale Hotels and other business enterprises.  In 2015, the Trustee installed himself as the manager of Morreale Hotels, thereby ousting the Debtor from center stage in both bankruptcy cases.  Exercising his business judgment, the Trustee sold the two commercial buildings owned by Morreale Hotels in order to pay Morreale Hotels creditors (many of which also had claims against the Debtor) and to obtain any surplus from the *Morreale Hotels* Case for the Individual Case.  The bottom-line results speak for themselves.  The Trustee disbursed $8,432,273.00 to creditors in the *Morreale Hotels* Case and $1,947,078.77 to creditors in the Individual Case.  Many of the claims paid were common to both bankruptcy cases.  The distributions were enough to pay all creditors in full, plus interest.  And, substantial surplus funds already have been paid to the Debtor through an interim distribution.  Such a result is quite rare in the world of bankruptcy.  By most measures, it was a remarkable success.

However, the Debtor sees it otherwise.  He and his various proxies contested almost everything the Trustee did.  The Debtor claims that the Trustee engaged in self-interested malfeasance or, at very least, mis-administered the two bankruptcy estates.  In essence, the Debtor contends that he should have remained in the lead role and the commercial buildings owned by Morreale Hotels should not have been sold in the way they were sold by the Trustee.  The Debtor also asserts that the Trustee should have paid creditors earlier and generated a greater surplus for the Debtor.  In emotional terms, he contends that the bankruptcy process ruined his life.

The final act in this long bankruptcy saga is a bitter fee fight over administrative expenses claimed by the Trustee's legal counsel: Brownstein Hyatt Farber Schreck, LLP ("BHFS").  BHFS faithfully and capably served its client over almost six years through one of the most adversarial Chapter 7 liquidations ever conducted in Colorado.  After completing its work, BHFS submitted a final fee application.  BHFS is requesting a large administrative expense award: $810,576.13.  Given that all creditors already have been paid in full, the economics dictate that every dollar which may awarded to BHFS is a dollar less for the Debtor.  So, a dispute was foreseeable.  The Debtor raised a myriad of challenges to BHFS' final fee application, many of which focus on the Trustee's alleged malfeasance.  The UST also contested some of BHFS' fees.  Most fee fights are resolved by compromise.  Not this one.  Instead, the Court presided over a three-day trial on BHFS' final administrative expense application and the objections.  All the main characters — the Trustee, the Debtor, and a BHFS lawyer — testified at trial.

As the curtain closes, the Court recognizes that this has been a challenging and very acrimonious bankruptcy proceeding.  Fee disputes themselves are difficult, especially where professionals have done substantial work and helped to achieve an

exceptional result.  The Court's statutory mandate under Section 330 Bankruptcy Code[1] is to allow "reasonable compensation for actual, necessary services" rendered by BHFS.  Toward that end, the Court has carefully considered the evidence within the statutory framework and binding appellate precedent.  The Court concludes that the Debtor and the UST raised a few valid objections.  So, BHFS is not entitled to all the compensation it requests.  However, the Court ultimately approves the majority of the administrative expenses sought by BHFS.

## II.    Jurisdiction and Venue.

The Court has jurisdiction to enter final judgment on this professional compensation dispute pursuant to 28 U.S.C. § 1334.  This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), since it concerns administration of the bankruptcy estate.  Venue is proper in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## III.    Procedural and Factual Background.

### A.    Employment of BHFS.

The Debtor filed for protection under Chapter 11 of the Bankruptcy Code on October 15, 2013 in the Individual Case.  (Docket No. 1.)[2]  On December 9, 2014, the Court converted the Individual Case from a Chapter 11 reorganization to a Chapter 7 liquidation.  (Docket Nos. 292, 293, 294, and 296.)  Tom Connolly was appointed as the Chapter 7 Trustee.  (Docket No. 298.)  Shortly thereafter, the Trustee moved to employ BHFS as legal counsel pursuant to Section 327.  (Docket No. 402.)  The Court approved the employment of BHFS effective *nunc pro tunc* to February 27, 2015.  (Docket No. 406.)  Since that time — almost 6 years — BHFS has continued to serve capably and effectively as legal counsel to the Trustee in the Individual Case.

### B.    The Fee Applications.

The current dispute focuses on BHFS' request for compensation.  During the pendency of the Individual Case, BHFS filed three interim applications for fees and costs followed more recently by a final application which also incorporates the prior compensation requests.

#### 1.    The First Application.

On October 23, 2015, BHFS filed "Brownstein Hyatt Farber Schreck, LLP's First Interim Application for Allowance of Fees and Expenses for the Period from February

---

[1]    11 U.S.C. § 101 *et seq.*  Unless otherwise indicated, all references to "Section" are to Sections of the Bankruptcy Code.

[2]    Unless otherwise indicated, the Court will refer to particular documents from the CM/ECF docket for the Individual Case, using the convention: "Docket No. ___."  Similarly, the Court will refer to particular documents from the CM/ECF docket for the *Morreale Hotels* Case using the convention: "Docket No. ___ in MH Case."

27, 2015, through September 30, 2015" (Docket No. 564, the "Initial Application"), in which BHFS sought approval of $145,526.50 in legal fees and $8,637.46 in costs incurred in connection with its representation of the Trustee.  Neither the Debtor nor any other party in interest objected to the Initial Application.  On November 25, 2015, the Court issued an Order on the Initial Application noting that the Court was "unable to adequately review and assess the reasonableness of the fees requested" by virtue of BHFS' failure to comply with L.B.R. 2016-1(a)(2) which establishes the procedures for compensation of professionals."  (Docket No. 586.)  The Court also observed that BHFS failed to follow the UST Fee Application Guidelines.  28 C.F.R. Part 58 Appendix A.  As a result, the Court denied the Initial Application without prejudice to BHFS filing an amendment conforming with such requirements.  BHFS subsequently filed a "Supplement" to the Initial Application (Docket No. 713) to comply with L.B.R. 2016-1(a) and the UST Fee Application Guidelines.  The Court refers to the Initial Application together with the Supplement as the "First Application."

In the First Application, BHFS divided its work into several categories as follows:

| Category | Hours | Fees Requested |
|---|---|---|
| Case Administration | 163.6 | $ 59,991.00 |
| Asset Disposition | 140.4 | $ 62,841.00 |
| Asset Recovery | 45.0 | $ 14,733.00 |
| Exemptions | 22.7 | $  6,646.50 |
| Retention/Fee Applications | 4.4 | $  1,315.00 |
| Total: | 376.1 | $145,526.50 |

Neither the Debtor nor any other party in interest objected to the First Application.  Notwithstanding the lack of objections, the Court independently scrutinized the First Application and issued its "Order Approving, in Part, Brownstein Hyatt Farber Schreck, LLP's First Interim Application for Allowance of Fees and Expenses" (Docket No. 756 and JM Ex. Y)[3], dated December 9, 2016, wherein the Court raised some concerns:

> This Court has reviewed carefully and in detail Applicant's First Interim Application and the Supplement, including the billing records submitted in support thereof (Docket No. 713-1, Exhibits 1-5).  This Court's review of the billing records, particularly for services charged in the category titled "Asset Disposition," raises concerns as to whether some of the services provided and charged were of benefit to this estate, or rather, were services provided for the benefit of the separate estate in the bankruptcy case:  *In re Morreale Hotels, LLC*, Case No. 12-35230 TBM.  The Applicant has

---

[3]     Both the Debtor and the UST used letters for their Exhibits at trial.  To avoid confusion in the record, the Court will refer to the Debtor's Exhibits as "JM Ex.___" and the UST's Exhibits as "UST Ex.___."

> not been approved as counsel for Morreale Hotels, LLC.
> Benefit to the estate is an essential finding this Court must
> make in order to comply with its statutory obligations under
> 11 U.S.C. 330(a)(1).  The benefit to the estate requirement is
> a threshold inquiry under the language of Section 330
> according to binding Tenth Circuit precedent.  *Rubner &*
> *Kutner v. U.S. Trustee (In re Lederman Enterprises, Inc.)*,
> 997 F.2d 1321 (10th Cir. 1993).
>
> Because the First Interim Application and Supplement are
> before the Court for allowance on an interim basis, this Court
> need not confront that concern at this juncture.  Instead, the
> Court will reserve determination of that threshold inquiry until
> Applicant seeks allowance of its fees and expenses incurred
> on a final basis.  The fees which are of concern represent
> only a fraction of the fees requested; and Applicant should
> be allowed the fees and expenses which are not in question.
> Thus, the Court determines that Applicant should be allowed
> 75% of the fees and 100% of its expenses requested.

(*Id.* at 2.)  Thus, the Court allowed, on an interim basis, only a portion of the fees and expenses requested in the First Application, approving fees in the amount of $109,144.87 and expenses in the amount of $8,637.46.  (*Id.*)  The other requested amounts were effectively held back from BHFS, subject to final consideration at the end of the Individual Case.  Subsequently, the Trustee paid BHFS the amounts allowed by the Court for the First Application.

### 2.    The Second Application.

Meanwhile, on August 4, 2016, BHFS filed "Brownstein Hyatt Farber Schreck, LLP's Second Interim Application for Allowance of Fees and Expenses for the Period from October 1, 2015 through May 31, 2016" (Docket No. 714, the "Second Application"), in which BHFS sought approval of $237,516.50 in legal fees and $8,023.28 in costs incurred in its representation of the Trustee.

In the Second Application, BHFS divided its work into several categories as follows:

| Category | Hours | Fees Requested |
|---|---|---|
| Case Administration | 247.8 | $102,169.00 |
| Asset Disposition | 211.8 | $ 89,466.00 |
| Asset Recovery | 68.0 | $ 22,752.50 |
| Exemptions | 56.6 | $ 17,840.50 |
| Retention/Fee Applications | 13.7 | $  5,079.50 |
| Claims Administration | .5 | $    209.00 |

| | | |
|---|---|---|
| Total: | 598.4 | $237,516.50 |

The Debtor objected to the Second Application on a variety of grounds including alleged lack of reasonableness and benefit to the estate.  (Docket Nos. 724 and 770.) After reviewing legal briefs on the issues arising from the Second Application as well as a "Stipulation Regarding Brownstein Hyatt Farber Schreck, LLP's Second Interim Application for Allowance of Fees and Expenses for the Period from October 1, 2015 through May 31, 2016" filed by BHFS and the Debtor (Docket No. 803), the Court approved, on an interim basis, $226,435.00 of the fees and $8,023.28 of the costs requested in the Second Application.  (Docket No. 804.)  Subsequently, the Trustee paid BHFS the amounts allowed by the Court for the Second Application.

### 3.    The Third Application.

On February 8, 2019, BHFS filed "Brownstein Hyatt Farber Schreck, LLP's Third Interim Application for Allowance of Fees and Expenses for the Period from June 1, 2016, through January 31, 2019" (Docket No. 988, the "Third Application"), in which BHFS sought approval of fees in the amount of $285,615.00 and reimbursement of expenses in the amount of $12,458.51.  In the Third Application, BHFS divided its work into several categories as follows:

| Category | Hours | Fees Requested |
|---|---|---|
| Case Administration | 146.2 | $ 71,581.00 |
| Asset Disposition | 15.1 | $  6,285.50 |
| Asset Recovery | 123.7 | $ 46,608.50 |
| Exemptions | 5.7 | $  1,828.00 |
| Retention/Fee Applications | 145.3 | $ 79,251.50 |
| Claims Administration | 131.8 | $ 80,060.50 |
| Total: | 567.8 | $285,615.00 |

Both the Debtor and the UST objected on the basis that fees charged for BHFS' defense of the Second Application as well as defense of the Trustee's "First Interim Application of Tom Connolly, Chapter 7 Trustee, for Allowance of Compensation and Expenses" (Docket No. 823, the "Trustee's Application") were not compensable as a matter of law under Section 330 and *Baker Botts L.L.P. v. ASARCO LLC*, 135 S. Ct. 2158 (2015).  (Docket Nos. 994 and 999.)  The Court refers to such objections as the "Fee Defense Attorneys' Fee Issues."  The UST and the Debtor also objected to the Third Application on a myriad of other grounds, including alleged lack of reasonableness and benefit to the estate.  (*Id.*)  The Court conducted a preliminary hearing on the Third Application and objections in order to determine the sequence and timing for adjudication.  (Docket No. 1017.)

After considering the respective positions of BHFS, the Debtor, and the UST, the Court determined, as a matter of efficiency and economy, that resolution of the dispute should proceed in stages.  First, the Court elected to decide the Fee Defense Attorneys' Fee Issues raised by the Debtor and the UST.  Then, the Court decided that all other objections to the First, Second, and Third Applications should be considered in the context of an anticipated Final Application to be made by BHFS in the future.

With respect to the Fee Defense Attorneys' Fee Issues, BHFS, the Debtor, and the UST submitted a "Stipulation" (Docket No. 1031) specifying the amount of the Fee Defense Attorneys' Fees.  The parties agreed that such fees were broken down into two categories: (1) Fee Defense Attorneys' Fees related to defense of the Second Application; and (2) Fee Defense Attorneys' Fees related to defense of the Trustee's Application (including prosecution of appeals).  In terms of amounts, the parties agreed that 27 of BHFS' timekeeper entries on dates between August 25, 2016 and January 14, 2019, constituting 47.8 hours of billable time valued at $22,850.00, were in defense of the Second Application.  Further, the parties agreed that 78 of BHFS' timekeeper entries on dates between May 5, 2017, and January 24, 2019, constituting 125 hours of billable time valued at $63,091.00, were in defense of the Trustee's Application (including prosecution of appeals).  Thereafter, the Court conducted a trial on the Fee Defense Attorneys' Fee Issues.  (Docket No. 1035.)

On July 3, 2019, the Court issued a "Memorandum Order and Opinion on Fee Defense Attorneys' Fees."  *In re Morreale*, 2019 WL 3385163 (Bankr. D. Colo. July 3, 2019) (Docket No. 1039 and 1040.)  The Court determined that the entire $85,941.00 in Fee Defense Attorneys' Fees contained in the Third Application must be denied and disallowed based upon the text of Section 330 and the United States Supreme Court's dispositive decision: *ASARCO*, 135 S. Ct. 2158.  All other matters with respect to the Third Application were reserved.  Since the Court did not allow any part of the Third Application, the Trustee did not pay BHFS anything with respect to the Third Application.

### 4.    **The Final Application.**

On July 31, 2020, BHFS filed "Brownstein Hyatt Farber Schreck, LLP's Fourth and Final Application for Allowance of Fees and Expenses" (Docket No. 1086, the "Final Application").  In the Final Application, BHFS requested that the Court approve and allow all the fees and costs contained in the First, Second, and Third Applications (including all amounts previously allowed as well as amounts held back or disallowed). Additionally, the BHFS requested approval and allowance of fees and costs incurred after January 1, 2019 (the last date covered by the Third Application).

The Court finds the Final Application to be a bit confusing and convoluted especially in relation to its "Summary of Fees and Expenses Requested" and the amount requested by BHFS for the 2019 and 2020 time period.  The Cover Sheet for the Final Application states that the "Amount of Fees Sought" is "$307,436.88 (reserving rights to "fee defense" fees) and the "Amount of Expense Reimbursement Sought" is

"$15,461.45." However, such amount is not the aggregate for the entire Individual Case. Instead, BHFS apparently is subtracting amounts already allowed and paid on an interim basis as well as Fee Defense Attorneys' Fees and certain other deductions.

With respect to the final time period (2019 and 2020), BHFS recites that the "Fees and expenses after last interim period" are $82,821.69. In the Final Application, BHFS divided its work into only two categories as follows:

| Category | Hours | Fees Requested |
|----------|-------|----------------|
| Case Administration | 106.2 | $ 66,290.00 |
| Retention/Fee Applications | 23.8 | $ 13,068.00 |
| Total: | 130.0 | $ 79,358.00 |

But the supporting invoices do not quite match. For example, the invoices show $13,002.25 for preparation of fee applications, not $13,068.00. And for case administration, the invoices are slightly internally inconsistent. Total fees are shown as either $66,815.00 or $66,302.00, not $66,290.00. Fortunately, the discrepancies are fairly minor. However, there is more confusion because BHFS also has included a further set of invoices with an additional 95.2 hours and $51,919.50 of fees for recent Fee Defense Attorneys' Fees. BHFS wishes to be compensated for that additional amount but understands that the Court likely will not allow Fee Defense Attorneys' Fees. *See Morreale*, 2019 WL 3385163. So, BHFS seems not to be including that additional amount in the $79,358 fee request total for 2019 and 2020. As best the Court can ascertain after sorting through all the figures, the 2019 and 2020 additional compensation requested by BHFS in the Final Application consists of total fees in the amount of $131,277.50 and reimbursement of expenses in the amount of $3,218.51.

## 5.    The Final Request.

In the end, the total amounts initially requested by BHFS in the First, Second, Third, and Final Applications (together, the "Applications") are as follows:

| Application | Fees | Costs | Total |
|-------------|------|-------|-------|
| First | $145,526.50 | $ 8,637.46 | $154,163.96 |
| Second | $237,516.50 | $ 8,023.28 | $245,539.78 |
| Third | $285,615.00 | $12,458.51 | $298,073.51 |
| Final | $131,277.50 | $ 3,218.51 | $134,496.01 |
| Total: | $799,935.50 | $32,337.76 | $832,273.26 |

During this difficult fee application process and as confirmed during closing argument, BHFS agreed to reduce the requested compensation by: (1) $8,637.50 to reflect a reduction for paralegal time; (2) $460.75 based upon a math error; (3) $2,178.06 for an

erroneous expense; and (4) $117.00 for a meal charge.  These voluntary reductions total $11,393.31.  So, according to the Court's calculations, BHFS is requesting a total award of $820,879.95 in fees and costs.  That figure is close to what the Debtor computed in its summary presented at trial: $813,015.01.  (Stip. Ex. 6.)

However, during closing argument, counsel for BHFS committed that the aggregate amount being requested by BHFS at this time is slightly less — $810,576.13 (which amount includes Fee Defense Attorneys' Fees).  That is a further reduction of $10,303.82[4] from the Court's computation and a bit less than what the Debtor had calculated.  Although the Court does not quite understand BHFS' math, the Court accepts the lower amount ($810,576.13 instead of $832,273.26) as the maximum allowable amount of aggregate compensation now requested by BHFS.

As noted previously, BHFS already has been paid — on an interim basis only — $109,144.87 of fees and $8,637.46 in expenses in relation to the First Application and $226,435.00 of fees and $8,023.28 in expenses for the Second Application.  Adding such amounts, BHFS has already received (subject to final allowance) interim compensation of $352,240.61.  Thus, BHFS wants final approval of the compensation already paid on an interim basis plus an additional $458,335.52, which all adds up to total compensation of $810,576.13.

## C.    The Services Provided by BHFS.

BHFS represented the Trustee as general bankruptcy counsel for almost six years in the Individual Case and billed approximately 1,768 hours.  The Individual Case and the related *Morreale Hotels* Case are among the most hotly contested bankruptcy proceedings over which the Court has ever presided.  It is not much exaggeration to say that the Debtor and his various proxies attacked almost every action undertaken by the Trustee — and they attacked hard.  Having observed the process over the years, the Court finds that much of the expense in the Individual Case is attributable to the Debtor's litigate-everything strategy, especially during the early stages of the Chapter 7 liquidation process.  Suffice to say that it was not an easy bankruptcy case.

As set forth in the Applications, BHFS has divided its fee request into several typical categories: case administration; asset disposition; asset recovery; exemptions; claims administration; and retention/fee applications.  In all time periods, the most significant category (by hours) was case administration.  Asset disposition featured more heavily in the First and Second Applications (2015-2016).  Asset recovery increased during the First, Second, and Third Applications then tapered off (2015-2016).

---

[4]      In the "Stipulation Regarding Brownstein Hyatt Farber Schreck, LLP's Second Interim Application for Allowance of Fees and Expenses for the Period from October 1, 2015 through May 31, 2016" filed by BHFS and the Debtor (Docket No. 803), the parties stipulated "to the entry of an order granting the Second [ ] Application with the exception of $11,081.50, which will be held back pending final hearing." That figure is close to the $10,303.82 reduction BHFS seems to be conceding now.  So, perhaps that is the explanation for the reduction.  The Debtor seems to believe that BHFS agreed to a $11,081.50 discount.  (Stip. Ex. 6.)  The UST also thinks so.  (Stip. Ex. 9.)  Again, while the figures do not quite add up, the differences are not material.

The exemption contests occurred earlier in the Individual Case (2015-2016).  And, claims work occurred toward the end (mostly in the Third Application) after the asset disposition and asset recovery work was completed (2016-2018).  In the last few years, the focus and time spent has been on professional compensation for both the Trustee and BHFS (2017-2020).  The Trustee insisted on additional compensation (*i.e.*, beyond the Section 326(a) cap) based upon disbursements in the *Morreale Hotels* Case.  The contest went on for years.  The Debtor prevailed.  *See Connolly v. U.S. Tr. (In re Morreale*), 595 B.R. 409 (10th Cir. BAP 2019), *aff'd*, 959 F.3d 1002 (10th Cir. 2020).  While the work ebbed and flowed during the bankruptcy case, most of the significant legal heavy lifting by BHFS occurred during the earlier stages of the Individual Case (2015-2016).

## D.    **The Objections.**

As set forth above, the Debtor objected to the Second and Third Applications.  Those objections are preserved.  In addition, the Debtor objected to the Final Application (which encompasses all of BHFS' work).  (Docket No. 1088, the "Debtor's Objection.")  The UST also objected to the Third Application.  That objection is preserved.  Finally, the UST objected to the Final Application.  (Docket No. 1095, the "UST Objection.")

In terms of the substance of the objections, both the UST and the Debtor objected to all the fees sought by BHFS for defense of the Second Application and defense of the Trustee's Application.  Both the UST and the Debtor objected to fees requested by BHFS for work pertaining to the *Morreale Hotels* Case.  However, the UST Objection is far narrower than the Debtor's Objection.  Both the UST and the Debtor objected to BHFS' paralegal time.  The Debtor argues that no paralegal time is compensable.  Again, the UST Objection is narrower.  Neither the UST nor the Debtor presented material objections to BHFS' costs.

In addition to the foregoing three common categories of objections, the Debtor has raised a myriad of other attacks on the Applications.  The Debtor objects to: all fees pertaining to resolution of the Internal Revenue Service proof of claim; all fees incurred in connection with the Trustee's responding to recent discovery in a state court lawsuit; the reasonableness of BHFS' hourly rates for professionals; and the overall compensation requested.  The Debtor seems to suggest, alternatively, that BHFS should receive nothing, or, at most, $298,240.61[5] or maybe $297,335.46.[6]  Since BHFS already received $352,240.61 in interim compensation, what the Debtor is effectively requesting is that BHFS return some or all of its interim compensation and receive nothing else.

---

[5]      During closing argument, counsel for the Debtor suggested that BHFS should refund $54,000 of the interim compensation BHFS already received.  BHFS received interim compensation of $352,240.61.  Subtracting $54,000 yields $281,579.87.

[6]      Debtor's Obj. at 21.

E.     **The Trial on the Applications**.

The Court conducted an evidentiary hearing on the factual and legal contest over the Applications as well as the Debtor's Objection and the UST Objection.  The trial lasted three days on the Zoom Government video platform.  The Court heard testimony from: the Trustee; the Debtor; the principal BHFS attorney responsible for the engagement to represent the Trustee in the Individual Case (Michael J. Pankow); and the Debtor's tax counsel (David A. Sprecace).  The Court admitted into evidence: Stipulated Exhibits 1-14; BHFS' Exhibits 1-3, 51-52, 61, 64-67, and 68; the UST's Exhibits C and D; and the Debtor's Exhibits D, H-L, and O-P.  The parties also asked the Court to take judicial notice of the last eight years of docket activity in both the Individual Case as well as the *Morreale Hotels* Case.  (Docket No. 1109.)  The combined docket entries in the Individual Case and the *Morreale Hotels* Case total more than 2,200 discrete events spanning almost eight years.  After the close of evidence, all the parties presented closing arguments.  During closing argument, BHFS specified that it was seeking total compensation of $810,576.13.  Furthermore, the parties agreed that the aggregate of Fee Defense Attorneys' Fees included in the Applications equals $143,362.00.  After closing arguments, the Court took the dispute under advisement. Since then, the Court has studied all the admitted exhibits, reviewed the witness testimony, considered the applicable law, and re-lived the last eight years of events though an extensive docket review. The issues are fully submitted and ripe for decision.

## IV.     Legal Analysis.

A.     **Law Applicable to Professional Compensation.**

The Applications together constitute BHFS' request for final approval of professional compensation for services and costs related to its representation of the Trustee in the Individual Case.  The starting place for the Court's legal analysis is, of course, the statutory text.  Section 327 provides that "the trustee, with the court's approval, may employ one or more . . . attorneys . . . or other professional persons . . . to represent or assist the trustee in carrying out the trustee's duties. . . ."   11 U.S.C. § 327(a).  BHFS, as a law firm, qualifies as a "professional person" within the ambit of Section 327.  And, the Court approved the Trustee's retention of BHFS, *nunc pro tunc* to February 27, 2015.  (Docket No. 406.)

Legal professionals, like BHFS, may request compensation in a bankruptcy case as an "administrative expense."  11 U.S.C. § 503(a).  The Bankruptcy Code states that "[a]fter notice and a hearing, there shall be allowed administrative expenses . . . including . . . compensation and reimbursement awarded under section 330(a) . . . ." 11 U.S.C. § 503(b)(2).  Such administrative expenses enjoy a relatively high priority in the Chapter 7 bankruptcy distribution pecking order — above unsecured claims and any surplus payable to a debtor.  11 U.S.C. §§ 507(a)(2) and 726(a).

The foregoing statutory cross-references eventually lead to an entire section of the Bankruptcy Code dedicated to "Compensation of Officers" which establishes a

comprehensive framework for fixing and allowing fees and costs of professionals:
Section 330.  Section 330(a)(1) sets the general standard and provides:

> After notice to the parties in interest and the United States
> Trustee and a hearing . . . , the court may award to a . . .
> professional person employed under section 327. . . (A)
> *reasonable compensation for actual, necessary services*
> *rendered* by the . . . professional person, or attorney and by
> any paraprofessional person employed by such person; and
> (B) reimbursement for actual, necessary expenses.

11 U.S.C. § 330(a)(1) (emphasis added.)[7]

Section 330(a)(3) gives more detail and sets forth a list of mandatory but non-
exclusive factors for the Court to consider in deciding compensation issues:

> In determining the amount of reasonable compensation to be
> awarded to . . . [a] professional person, the court shall
> consider the nature, the extent, and the value of such
> services, taking into account all relevant factors, including —
>
> (A)    the time spent on such services;
>
> (B)    the rates charged for such services;
>
> (C)    whether the services were necessary to the
>        administration of, or beneficial at the time at which the
>        service was rendered toward the completion of, a
>        case under this title;
>
> (D)    whether the services were performed within a
>        reasonable amount of time commensurate with the
>        complexity, importance, and nature of the problem,
>        issue, or task addressed;
>
> (E)    with respect to a professional person, whether the
>        person is board certified or otherwise has
>        demonstrated skill and experience in the bankruptcy
>        field; and
>
> (F)    whether the compensation is reasonable based on
>        the customary compensation charged by comparably
>        skilled practitioners in cases other than cases under
>        this title.

---

[7]    The Court also has the discretion to "award compensation less than the amount of compensation
that is requested."  11 U.S.C. § 330(a)(2).

11 U.S.C. § 330(a)(3).  In addition to identifying "relevant factors" that courts should consider, Congress also instructed that courts "shall not allow compensation for — (i) unnecessary duplication of services; or (ii) services that were not — (I) reasonably likely to benefit the debtor's estate; or (II) necessary to the administration of the case." 11 U.S.C. § 330(a)(4)(A).

Analytically, the threshold for professional compensation is benefit to the estate.[8] Benefit to the estate is shorthand way of referring to the statutory requirement that services and expenses are necessary.  *Rubner & Kutner, P.C. v. U.S. Tr. (In re Lederman Enters., Inc.)*, 997 F.2d 1321, 1323 (10th Cir. 1993) ("An element of whether services were 'necessary' is whether they benefited the bankruptcy estate.").  The concepts of necessity (*i.e.*, "necessary" services and expenses) and benefit are repeated in Sections 330(a)(1)(A), (a)(1)(B), (a)(3)(C), (a)(4)(A)(i), and (a)(4)(A)(ii).  According to binding appellate precedent, "the beneficial nature of legal services must be determined before a reasonableness inquiry may even be conducted."  *Lederman Enters.*, 997 F.2d at 1323.

The second main stage in the compensation inquiry is to assess whether the requested fees and expenses are reasonable.  After all, Section 330(a)(1) permits the Court to allow only "reasonable compensation."  Many of the factors listed in Section 330(a)(3) address reasonableness.  11 U.S.C. §§ 330(a)(3)(A), (B), and (D)-(F).  The United States Court of Appeals for the Tenth Circuit (the "Tenth Circuit") has instructed that "the adjusted lodestar[9] approach must be used to calculate reasonable attorney's fees" in bankruptcy cases.  *Mkt. Ctr.*, 730 F.3d at 1246; *see also Houlihan Lokey Howard & Zukin Cap. v. Unsecured Creditors' Liquidating Tr. (In re Com. Fin. Serv., Inc.)*, 427 F.3d 804, 811 (10th Cir. 2005) (requiring use of adjusted lodestar analysis).  The adjusted lodestar approach requires consideration of the Section 330(a)(3) factors

---

[8]     Although the Court uses the phrase "benefit to the estate," the Court acknowledges that actual benefit may not always be required.  Instead, to be a little more specific and technical, Congress enacted a broader view of benefit which encompasses work "beneficial at the time at which the service was rendered toward the completion of, a case under this title" and "reasonably likely to benefit the debtor's estate."  11 U.S.C. §§ 330(a)(3)(C) and (a)(4)(A)(ii)(I).  "Section 330 . . . explicitly contemplates compensation for attorneys whose services were reasonable when rendered but which ultimately may fail to produce an actual, material benefit."  *Barron & Newburger, P.C. v. Texas Skyline, Ltd. (In re Woerner)*, 783 F.3d 266, 274 (5th Cir. 2015); *see also Mkt. Ctr. E. Retail Prop., Inc. v. Lurie (In re Mkt. Ctr. E. Retail Prop., Inc.)*, 730 F.3d 1239, 1248 (10th Cir. 2013) ("under § 330, the payment of fees does not depend on whether one party has prevailed over the other.").  Recognizing the foregoing, the Court utilizes the phrase "benefit to the estate" somewhat liberally throughout this decision in the sense of referring to services with actual benefit (to the estate or completion of the case), as well as work reasonably likely to benefit the estate or completion of the case even if the professional did not prevail.

[9]     The term "lodestar" refers to the number of hours reasonably spent for professional services multiplied by a reasonable hourly rate.  *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983). ("The most useful starting point for determining the amount of a reasonable fee is the number of hours reasonably expended on the litigation multiplied by a reasonable hourly rate.  This calculation provides an objective basis on which to make an initial estimate of the value of a lawyer's services."); Bryan A. Garner, BLACK'S LAW DICTIONARY 1084 (Thomson Reuters 10th ed. 2014) ("lodestar" means "a reasonable amount of attorney's fees . . . usu. calculated by multiplying a reasonable number of hours worked by the prevailing hourly rate . . . .").

*plus* the so-called "*Johnson* factors."  *Mkt. Ctr.,* 730 F.3d at 1246; *Com. Fin.*, 427 F.3d at 811.  The twelve *Johnson* factors are:

> (1)  The time and labor required;
>
> (2)  The novelty and difficulty of the questions;
>
> (3)  The skill requisite to perform the legal service properly;
>
> (4)  The preclusion of other employment by the attorney due to acceptance of the case;
>
> (5)  The customary fee;
>
> (6)  Whether the fee is fixed or contingent;
>
> (7)  Time limitations imposed by the client or the circumstances;
>
> (8)  The amount involved and the results obtained;
>
> (9)  The experience, reputation, and ability of the attorneys;
>
> (10)  The "undesirability" of the case;
>
> (11)  The nature and length of the professional relationship with the client; and
>
> (12)  Awards in similar cases.

*Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir.1974).  The Tenth Circuit repeatedly has confirmed that bankruptcy judges must consider both the Section 330(a)(3) and *Johnson* factors — and only those factors — in evaluating the reasonableness of bankruptcy fee applications.  *Mkt. Ctr.*, 730 F.3d at 1248-49; *see also Com. Fin.*, 427 F.3d at 811; *First Nat'l Bank of Lea Cnty. v. Niccum (In re Permian Anchor Serv., Inc.)*, 649 F.2d 763, 768 (10th Cir. 1981) (adopting *Johnson* factors).

Importantly, the burden is on the party requesting fees and costs "to establish that its request is reasonable."  *Mkt. Ctr.*, 730 F.3d at 1246; *Com. Fin.*, 427 F.3d at 811.  But, in the end, bankruptcy courts have wide discretion in the compensation approval exercise.  *Mkt. Ctr.,* 730 F.3d at 1250 ("bankruptcy court has discretion in determining how much weight to assign each factor and in determining the reasonableness of a fee"); *Com. Fin.*, 427 F.3d at 810 ("Under 11 U.S.C. § 330(a)(1), bankruptcy courts have wide discretion in awarding compensation to attorneys . . . so long as it is reasonable.").

14

Discretion is necessary because "no matter how close the court comes to an objective determination of a reasonable fee, the fee determination is still, in the final analysis, a substantially subjective exercise." *Mkt. Ctr.*, 730 F.3d at 1251 (quoting *Staiano v. Cain (In re Lan Assocs. XI, L.P.),* 192 F.3d 109, 122 (3d Cir. 1999)).  Although fee applications must be carefully scrutinized under the proper legal framework, the Court also recognizes that appropriate compensation of professionals is "the lubricant which makes the bankruptcy machinery work when applied in the proper places in the proper amount . . . ."  *In re King Resources*, 651 F.2d 1349, 1352 (10th Cir. 1981).

**B.  Analysis of Benefit to the Estate for BHFS' Fees and Expenses.**

**1.  BHFS' Work on the Fee Defense Attorneys' Fees Issues Rendered No Benefit to the Estate.**

In the First, Second, Third, and Final Applications, BHFS requested allowance of substantial fees and costs for fee application defense work.  Such services included: (1) $22,850 in Fee Defense Attorneys' Fees related to defense of the Second Application against the Debtor's objections; and (2) $120,296.50 in Fee Defense Attorneys' Fees related to defending the Trustee's Application against the Debtor's objections.  *See Morreale,* 2019 WL 3385163, at *4.[10]  In closing arguments, the parties stipulated to slightly higher aggregate Fee Defense Attorneys' Fees totaling $143,362.00.  Furthermore, the costs for fee defense work total: $1,761.12.[11]  The UST and the Debtor both objected to compensation for all of BHFS' fee application defense work.

**a.  BHFS' Defense of the Second Application.**

The first category of BHFS' fee defense work (*i.e.*, Fee Defense Attorneys' Fees related to defense of the Second Application) is fairly self-explanatory and benefited BHFS rather than the bankruptcy estate.  BHFS filed the Second Application.  The Debtor objected.  And then BHFS spent time defending its work and request for compensation.  BHFS billed for the fee defense work in the Third Application.

**b.  BHFS' Defense of the Trustee's Application and the Appeals.**

The second category of BHFS' fee defense work (*i.e.*, Fee Defense Attorneys' Fees related to defense of the Trustee's Application) is more complicated and was for the benefit of the Trustee, not for the benefit of the bankruptcy estate.  The Trustee filed

---

[10]    The parties stipulated to the $22,850.00 figure for Fee Defense Attorneys' Fees related to defense of the Second Application in 2019.  (Docket No. 1031.)  The $120,296.50 figure for Fee Defense Attorneys' Fees related to defense of the Trustee's Application is based upon: (1) a stipulation in 2019 specifying then-incurred fees of $63,091.00 (Docket No. 1031); (2) an additional $51,919.50 listed in the Final Application at Ex. B-3; and (3) an additional $5,286.00 conceded by BHFS during closing argument.

[11]    The costs for fee defense work consist of: (1) $215.57 in costs listed in the Final Application at Ex. B-3; (2) $505.00 in costs listed in the Final Application at Ex. B-2 for a "filing fee" for filing an appeal; and (3) 1,040.55 in costs listed in the Third Application at Ex. B-4 for computerized legal research and filing an appeal.

the Trustee's Application wherein he sought allowance of $260,000.00 in compensation under Sections 326(a) and 330(a)(7).  Section 330(a)(7) states:

> In determining the amount of reasonable compensation to be awarded to a trustee, the court shall treat such compensation as a commission, based upon section 326.

11 U.S.C. § 330(a)(7).  In turn, Section 326(a) establishes a complex formula for calculating a Chapter 7 trustee's compensation.  The statute states:

> In a case under chapter 7 or 11, . . . the court may allow reasonable compensation under section 330 of this title of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such monies in excess of $1,000,000, *upon all moneys disbursed or turned over in the case by the trustee* to parties in interest excluding the debtor, but including holders of secured claims.

11 U.S.C. § 326(a) (emphasis added).

Thus, the statutory text allows Chapter 7 trustee compensation on a sliding scale of percentages based upon the disbursements *in the case*.  However, in the Trustee's Application, the Trustee sought compensation based upon $1,947,078.77 in distributions in the Individual Case plus $8,432,273.80 in distributions in the separate but related *Morreale Hotels* Case.  The Debtor objected to the Trustee's Application on the basis that the Trustee was not entitled to a commission based upon distributions in the *Morreale Hotels* Case and instead was limited only to disbursements made in the Individual Case.  (Docket No. 830.)

At that point, the Trustee requested that BHFS assist the Trustee in defending the Trustee's Application.  BHFS did so, and billed the estate in the Individual Case. Ultimately, the Court concluded that although the Trustee's efforts in the *Morreale Hotels* Case benefited the estate in the Individual Case, the Court was not authorized to allow the Trustee compensation for disbursements made in the *Morreale Hotels* Case. Thus, the Court issued a "Supplemental Order on Trustee's First Interim Application" disallowing the Trustee compensation based upon disbursements made in the *Morreale Hotels* Case.  (Docket No. 927, the "Trustee Fee Denial Order.")  The decision was based strictly on the statutory text and did not focus on whether the Trustee's work benefited the estate in the Individual Case.

The Trustee elected to appeal the Trustee Fee Denial Order to the Bankruptcy Appellate Panel for the Tenth Circuit Court of Appeals (the "BAP").  (Docket Nos. 937-

940.)  Again, BHFS represented the Trustee and billed the estate in the Individual Case for the appellate advocacy.  The BAP affirmed the Trustee Fee Denial Order.  *Connolly v. U.S. Tr. (In re Morreale)*, 595 B.R. B.R. 409 (10th Cir. BAP 2019).  Once again, the Trustee appealed and asked BHFS for more help.  BHFS obliged and billed the estate in the Individual Case for representation of the Trustee on further appeal.  Recently, the Tenth Circuit affirmed the Trustee Fee Denial Order.  *Connolly v. Morreale (In re Morreale)*, 959 F.3d 1002 (10th Cir. 2020).  The appellate court stated:

> Section 326(a) permits calculating a Chapter 7 bankruptcy trustee's compensation using only moneys disbursed by the trustee in the case in which the trustee serves.  Finding Section 326(a)'s language plain, we affirm the bankruptcy court.

*Id*. at 1010.  So, BHFS' efforts defending the Trustee Application were unsuccessful.

### c.      The Court's Previous Decision on Fee Defense Attorneys' Fees.

In the Third Application, BHFS requested compensation for defense of the Second Application as well as defense of the Trustee's Application.  As explained previously, both the UST and the Debtor objected on the basis that fees charged for BHFS' defense of the Second Application as well as defense of the Trustee's Application were not compensable as a matter of law under Section 330(a) and *ASARCO*, 135 S. Ct. 2158.  (Docket Nos. 994 and 999.)  Given the impasse, the Court conducted a trial on the Fee Defense Attorneys' Fee Issue.  (Docket No. 1035.)  Thereafter, the Court issued a "Memorandum Order and Opinion on Fee Defense Attorneys' Fees," *Morreale*, 2019 WL 3385163, wherein the Court construed Section 330(a) and interpreted *ASARCO*, 135 S. Ct. 2158.  The Court determined that the entire amount of BHFS' Fee Defense Attorneys' Fees contained in the Third Application must be denied and disallowed**.**  BHFS did not appeal.

### d.      The Fee Defense Attorneys' Fees Are Rejected.

The Court understands that BHFS disagrees with the Court's decision in *Morreale*, 2019 WL 3385163.  So be it.  Apparently to preserve its arguments, BHFS now requests allowance of aggregate Fee Defense Attorneys' Fees of $143,362.00 and costs of $1,761.12 as itemized in the Third Application and the Final Application.  Again, the UST and the Debtor have objected to the allowance of all Fee Defense Attorneys' Fees and related costs based upon the text of Section 330(a) and *ASARCO*, 135 S. Ct. 2158.

The Court rejects all of the Fee Defense Attorneys' Fees and related costs requested by BHFS on the merits for the exact same reasons already explained in detail in *Morreale*, 2019 WL 3385163.  Although the Court does not question the quality of BHFS' advocacy, its work defending the Second Application benefited only BHFS, not

17

the bankruptcy estate in the Individual Case.  Furthermore, BHFS' unsuccessful work defending the Trustee's Application and pursuing multiple appeals benefited the Trustee, not the bankruptcy estate in the Individual Case.  *See also ASARCO*, 135 S. Ct. at 2166 ("We decline to adopt a reading of § 330(a)(1) that would allow courts to pay professionals for arguing for fees they were found never to have been entitled to in the first place" [*i.e.*, unsuccessful fee defense].").  Section 330(a), as well as binding United States Supreme Court precedent, dictate that the Court may not allow the $143,362.00 in Fee Defense Attorneys' Fees and $1,761.12 in costs requested by BHFS.

There is another reason why the Court summarily denies BHFS' Fee Defense Attorneys' Fees and associated costs now.  The issue already has been presented and decided in this same case: *Morreale*, 2019 WL 3385163.  So, under the law of the case doctrine, BHFS is precluded from relitigating the issue.  *In re Antrobus*, 563 F.3d 1092, 1098 (10th Cir. 2009) ("The doctrine bars reopening a question already decided in an earlier stage of the same litigation . . .."); *FHA v. Buckner (In re Buckner)*, 218 B.R. 137, 142 (10th Cir. BAP 1998) ("The policy behind the doctrine is to promote both judicial efficiency and the public policy that litigation should come to an end, and the doctrine is designed to quickly resolve disputes preventing continued reargument of issues already decided.); *Jenkins v. FMC Tech., Inc.*, 2009 WL 1526022, at *2 (D. Colo. May 28, 2009) ("The doctrine of law-of-the-case was 'created to ensure judicial efficiency and to prevent the possibility of endless litigation.'").  Furthermore, none of the narrow exceptions to the law of the case doctrine apply because BHFS has not offered substantially different and previously unavailable evidence, there has been no change in the law, and the Court's previous decision is not clearly erroneous such that BHFS would suffer manifest injustice.  *Antrobus*, 563 F.3d at 1098 (listing three narrow exception to law of the case doctrine).  Thus, on the merits and also based on the law of the case doctrine, the Court disallows $143,362.00 in Fee Defense Attorneys' Fees and $1,761.12 in costs requested by BHFS.

## 2. **Most of BHFS' Work Involving the *Morreale Hotels* Case Benefited the Estate and Was Reasonable.**

Several years ago, in 2016, the Court expressed concerns "as to whether some of the services provided and charged [by BHFS] were of benefit to this estate [Individual Case], or rather, were services provided for the benefit of the separate [*Morreale Hotels* Case] estate . . . ."  (Docket No. 756 and JM Ex. Y.)  The Court simply noted the issue, leaving it for later determination.  After submission of the Final Application, both the UST and the Debtor objected to some of the fees requested by BHFS for work involving the *Morreale Hotels* Case.

The Court starts its analysis of the *Morreale Hotels* Case objection by confirming that BHFS was not engaged under Section 327 as approved bankruptcy counsel for Morreale Hotels in the *Morreale Hotels* Case.  Instead, the Kutner Brinen and Garber, P.C. law firm ("Kutner Brinen") fulfilled that role.  BHFS was engaged only in the Individual Case to represent the Trustee.  But, beyond those commonly-accepted facts, the objections raise difficult issues concerning the proper role of BHFS in the two

18

bankruptcy cases.  The issues are not black-and-white because of the extremely close relationship between the Individual Case and the *Morreale Hotels* Case.

### a.   The Intertwined Nature of the Individual Case and the *Morreale Hotels* Case.

To resolve the objections to the Applications, an understanding of the relationship between Individual Case and the *Morreale Hotels* Case is paramount.  The Debtor owned and managed restaurants, nightclubs, bars, and hotels through a complicated web of related entities.  The Debtor formed Morreale Hotels, a Colorado limited liability company, as a corporate vehicle for certain of his business enterprises.  Morreale Hotels owned two buildings in Denver: a property located at 101-115 Broadway Avenue (the "Broadway Property"); and a property located at 3015 E. Colfax Avenue (the "Colfax Property").  It was mainly a redevelopment play.  Morreale Hotels spent considerable time and resources to revitalize the Broadway Property and Colfax Property but, in doing so, also incurred substantial debt.  The Debtor was the driving force behind Morreale Hotels.  He was the sole member and sole manager of Morreale Hotels.  In other words, he completely controlled Morreale Hotels.  The Debtor also personally guaranteed much of Morreale Hotels' debt including to its principal secured lender:  2011-SIP-1 CRE/CADC Venture, LLC ("SIP/CRE").  *See In re Morreale*, 2015 WL 3897796, at *2 (Bankr. D. Colo. Jun. 22, 2015).  Thus, the Debtor's financial well-being was very much tied up with Morreale Hotels.  At trial, the Trustee characterized the two bankruptcy cases as "scrambled," "intertwined," and "tangled."  Even the Debtor agrees.  He testified that "anything that happened in the [*Morreale Hotels]* Case impacted the Individual Case so much."

### 1.   The *Morreale Hotels* Case.

During 2012, Morreale Hotels became embroiled in disputes with SIP/CRE and the City and County of Denver related to debt repayment as well as the condition of the Broadway Property.  SIP/CRE began foreclosure proceedings against the Broadway Property after Morreale Hotels and the Debtor failed to pay SIP/CRE.  As a result of the foreclosure proceedings and other events, on December 14, 2012, Morreale Hotels filed for protection under Chapter 11 of the Bankruptcy Code and initiated the *Morreale Hotels* Case.  (Docket No. 1 in MH Case.)  The choice to file for bankruptcy was made by the Debtor, since he was the sole owner and sole manager of Morreale Hotels.  In the early stages of the *Morreale Hotels* Case, the Debtor continued to manage Morreale Hotels as a debtor-in-possession.  *See Morreale,* 2015 WL 3897796, at *2.

In its initial Schedules, Morreale Hotels asserted that it had only $1,405,588.00 in assets against liabilities of $6,873,870.00.  (Docket No. 27 in MH Case.)  Further, Morreale Hotels stated that the current value of the Broadway Property was $920,000.00 and the current value of the Colfax Property was $404,980.00.  (*Id.*)  The Debtor signed the Schedules attesting to the values of the Broadway Property and the Colfax Property.  (*Id.*)

Later, creditors filed claims in the *Morreale Hotels* Case as follows:

| Claim No. | Claimant | Amount[12] |
|---|---|---|
| 1 | City and County of Denver (Treasury) | $ 76,062.79 |
| 2 | Littler Mendelson, P.C. (Transferred to Belladonna, LLC) | $ 339,646.45 |
| 3 | City and County of Denver (Econ. Develop.) | $ 307,254.61 |
| 4 | City and County of Denver (Econ. Develop.) | $ 295,637.65 |
| 5 | Sander Ingebretsen & Wake, P.C (Transferred to Belladonna, LLC / Sketch Restaurant, LLC) | $ 11,653.92 |
| 6 | U.S. Small Business Administration | $ 1,579,820.12 |
| 7 | SIP/CRE | $ 1,255,598.02 |
| 8 | SIP/CRE | $ 2,294,659.45 |
| 9 | J.R. Harris and Co. | $ 68,761.26 |

On April 3, 2013, Morreale Hotels filed its first "Plan of Reorganization." (Docket No. 95 in MH Case.) In that plan, Morreale Hotels proposed to restructure secured debt and pay unsecured creditors just $100,000.00, plus proceeds of unspecified avoidance actions, if any. (*Id.*) A few weeks later, Morreale Hotels submitted its first "Disclosure Statement." (Docket No. 103 in MH Case.) In the first Disclosure Statement, Morreale Hotels reconfirmed the values of the Broadway Property and Colfax Property as listed on the Schedule A/B and projected that in a Chapter 7 liquidation, unsecured creditors would receive "$0" "based on unsecured and deficiency claims of approximately $5.3 million." (Docket No. 103 at 34 in MH Case.)

Morreale Hotels submitted two "Amended Plans of Reorganization" with similar terms. (Docket Nos. 139 and 150 in MH Case.) Later, Morreale Hotels filed an "Amended Disclosure Statement." (Docket No. 151 in MH Case.) In the Amended Disclosure Statement, Morreale Hotels substantially lowered the estimated value of the Broadway Property to just $241,416.00. Again, Morreale Hotels projected that in a Chapter 7 liquidation, unsecured creditors would receive "$0" "based on unsecured and deficiency claims of approximately $5.3 million." (Docket No. 151 at 37 in MH Case.) Morreale Hotels submitted a few more "Amended Disclosure Statements" with the same values and liquidation projections. (Docket Nos. 183 and 196 in MH Case.) To be consistent, on August 1, 2013, Morreale Hotels amended its Schedule A/B to reflect a reduction in the value of the Broadway Property to $241,416.00 while the Colfax Property remained at a $404,980.00 value. (Docket No. 190 in MH Case.) Suffice to say that the picture appeared bleak for both secured and unsecured creditors.

Under the Debtor's leadership and control, Morreale Hotels made no real progress in the *Morreale Hotels* Case in 2012 and 2013. Instead, the *Morreale Hotels* Case devolved into a vehicle for seemingly endless disputes and litigation mainly between the Debtor and SIP/CRE.

---

[12] The summary of claims is based on the originally-filed amounts. Some of the claims were later amended or transferred.

## 2.    **The Individual Case.**

Meanwhile, SIP/CRE continued to pursue the Debtor personally on his guaranty. Obtaining no satisfaction, SIP/CRE started a lawsuit against the Debtor on the guaranty in the District Court for the City and County of Denver, Colorado (the "State Court.")  On September 30, 2013, the State Court entered judgment in favor of SIP/CRE and against the Debtor in the amount of $3,550,257.00 plus statutory interest at the rate of eight percent per annum.  The entry of the judgment against the Debtor caused the Debtor to file his own Individual Case also under Chapter 11 of the Bankruptcy Code on October 29, 2013.  Like the *Morreale Hotels* Case, the Individual Case also failed under the Debtor's leadership and control.

In his Schedules, the Debtor listed assets of $3,623,699 against liabilities of $7,152,069 — thus suggesting an insolvent Individual Case estate from the start. (Docket No. 17.)  On the asset side of the ledger, the Debtor claimed that his interest in 100% of the equity of Morreale Hotels was worth $0.  (*Id.*)  Later, creditors filed claims in the Individual Case as follows:

| Claim No. | Claimant | Amount[13] |
|-----------|----------|------------|
| 1 | City and County of Denver (Treasury) | $     11,183.96 |
| 2 | Internal Revenue Service | $     92,521.74 |
| 3 | Colorado Department of Revenue | $            0.00 |
| 4 | GE Capital Retail Bank | $       2,500.00 |
| 5 | City and County of Denver (Econ. Develop.) | $   288,366.27 |
| 6 | City and County of Denver (Econ. Develop.) | $   307,254.61 |
| 7 | City and County of Denver (Econ. Develop.) | $     66,300.22 |
| 8 | SIP/CRE | $ 3,567,376.55 |
| 9 | Colorado Lending Source (Servicer for U.S. Small Business Administration | $ 1,618,056.02 |
| 10 | U.S. Trustee | $       1,300.27 |
| 11 | J.R. Harris and Co. | $     78,368.73 |
| 12 | Jesse Morreale | $       3,274.40 |
| 13 | Colorado Lending Source (Servicer for U.S. Small Business Administration) | $ 1,618,056.02 |
| 14 | Foster Graham Milstein & Calisher LLP | $     20,056.06 |

## 3.    **The _Morreale Hotels_ Case and the Individual Case Proceed in Tandem under the Debtor's Leadership.**

For about a year (from October 29, 2013 to December 9, 2014), the *Morreale Hotels* Case and the Individual Case proceeded in tandem with the Debtor serving as the lead in both bankruptcy proceedings. The parties recognized the substantial

---

[13]    The summary of claims is based on the originally filed amounts.  Some of the claims were later amended or transferred.  At least one of the claims is a duplicate.

intersection between the cases, especially in terms of filed claims.  The claims of SIP/CRE, the U.S. Small Business Administration, the City and County of Denver (Treasury), the City and County of Denver (Office of Economic Development), and J.R. Harris & Co. overlapped.

After the Debtor filed the Individual Case, Morreale Hotels filed yet another "Amended Plan of Reorganization." (Docket No. 281 in MH Case.)  Eventually, after various objections (from SIP/CRE and the UST) and some delay, the Court conducted a four-day trial on confirmation issues.  (Docket Nos. 391-392, 396, and 401 in MH *Case.*)  The Court denied confirmation of Morreale Hotels' "Amended Plan of Reorganization" on May 16, 2014.  (Docket Nos. 405 and 406 in MH Case.)  Morreale Hotels appealed the denial of confirmation.  (Docket No. 424 in MH Case.)  Later, Morreale Hotels filed a few more "Amended Plans of Reorganization." (Docket Nos. 574 and 592 in MH Case.)  In spite of six tries, Morreale Hotels, under the Debtor's leadership, ultimately failed to achieve confirmation of a reorganization plan.

Meanwhile, in the Individual Case, the Debtor started to try to "reorganize," but his plans depended entirely on the *Morreale Hotels* Case.  On October 10, 2014, the Debtor filed a "Plan of Reorganization."  (Docket No. 224, the "Morreale Plan.")  A few weeks later, on October 31, 2014, the Debtor submitted his "Disclosure Statement. (Docket No. 246, the "Morreale Disclosure Statement.")  The Debtor based his entire reorganization effort on Morreale Hotels' paying his most significant creditors.  For example, the Debtor proposed the following treatment for SIP/CRE:

> The Class 4 creditor [SIP/CRE] has filed a Proof of Claim asserting an unsecured claim in the amount of $3,258,876.55. The Class 4 creditor's unsecured claim is secured in the Morreale Hotels Chapter 11 proceeding by a deed of trust recorded against the Broadway Property and the Colfax Property. The Debtor has personally guaranteed the repayment of the Class 4 creditor's unsecured claim to the extent, if any, that there is a deficiency.  The Hotel Plan, if confirmed, provides for the repayment of the Class 4 creditor's allowed secured and allowed unsecured claims in full.  As such, the allowed unsecured claim of the Class 4 creditor shall be paid as provided for in the Hotel Plan, and the Debtor will not pay the unsecured claim of the Class 4 creditor.

(Docket No. 224 at 11-12).  The Debtor also proposed that the City and County of Denver Office of Economic Development would recover on its claim through the *Morreale Hotels* Case, which would reduce any liability of the Debtor.  (*Id.* at 12-13.) And, the Debtor told his unsecured creditors:  "The holders of general allowed unsecured claims . . . shall be paid pursuant to the provisions of the [Morreale] Hotel Plan." (*Id.* at 13.)  So, the Debtor himself recognized the close nexus between the Individual Case and the *Morreale Hotels* Case.

Although the Debtor attempted to use the assets of Morreale Hotels to pay the creditors in the Individual Case, the Debtor consistently acknowledged that he had no real equity in Morreale Hotels because the liabilities of Morreale Hotels exceeded the company's assets.  For example, in the Morreale Disclosure Statement, the Debtor stated that "there is no perceived value in the company [Morreale Hotels]."  (Docket No. 246 at 17.)  The Debtor further advised the Court and creditors:

> The Debtor estimates that liquidation under Chapter 7 of the Bankruptcy Code would result in a payment of 38.2% to general unsecured creditors . . . .  The Debtor believes that there would be sufficient Assets to pay Chapter 7 administrative expenses and allowed Chapter 11 administrative expenses in full, but not allowed unsecured claims.

(*Id.* at 45.)  The Debtor also attached a Liquidation Analysis to the Morreale Disclosure Statement listing assets of only $1,052,347 and confirming the projected 38.2% to unsecured creditors in a liquidation.  The Debtor touted the Morreale Plan as better than a Chapter 7 liquidation which would not pay unsecured creditors in full.  However, the Morreale Plan never really advanced.  (Docket No. 252.)

Instead, just two months after the Debtor presented the Morreale Plan, the Court conducted a multi-day trial on conversion of the Individual Case from Chapter 11 to Chapter 7.  After considering the evidence and the law, on December 9, 2014, the Court converted the Individual Case from Chapter 11 to Chapter 7.  (Docket Nos. 293 and 294.)  The Debtor sought a stay of conversion and reconsideration of conversion (Docket Nos. 312 and 313), which the Court denied.  (Docket Nos. 316 and 317.)  So, the Debtor appealed the conversion.  (Docket No. 324.)  He asked for another stay (Docket No. 326), which was denied by the Court.  (Docket No. 333.)  The appellate court also denied a stay.  *Morreale v. 2011-SIP-1 CRE/CADC Venture LLC (In re Morreale)*, 2015 WL 429502 (D. Colo. Jan. 30, 2015.)

### b.    The Trustee Forges a New Path.

Such was the status of the Individual Case and the *Morreale Hotels* Case when the Trustee was appointed on December 10, 2014.  (Docket No. 298.)  Effective February 27, 2015, the Trustee retained BHFS.  (Docket No. 406.)  The Trustee promptly came to the conclusion that in order to maximize recovery for creditors in the Individual Case, he would need to take control of Morreale Hotels and liquidate its assets too.  The two bankruptcy cases were closely related because, among other things: (1) the Debtor wholly owned Morreale Hotels; (2) the Debtor managed Morreale Hotels; (3) the most significant creditors in the Individual Case and the *Morreale Hotels* Case overlapped; and (4) any recovery for the creditors in the Individual Case depended on liquidation of the Morreale Hotels assets: the Broadway Property and the Colfax Property.

23

So, relying on *In re Albright*, 291 B.R. 538, 541 (Bankr. D. Colo. 2003), the Trustee filed a "Motion to Approve Change in Management of the Debtor" in the *Morreale Hotels* Case, whereby he sought to remove the Debtor as Manager of Morreale Hotels. (Docket No. 634 in MH Case.) The Court granted the relief requested by the Trustee. (Docket No. 694 in MH Case.) Thus, the Trustee became the Manager of Morreale Hotels. Acting as the new Manager of Morreale Hotels, the Trustee proceeded toward liquidation of the Broadway Property and the Colfax Property in the *Morreale Hotels* Case. On March 5, 2015, Morreale Hotels (under the Trustee's control) filed a Motion to sell the Broadway Property and the Colfax Property (Docket No. 637 in MH Case, the "Sale Motion") and Motion to establish bid procedures. (Docket No. 640 in MH Case.)

This set off a sustained and multi-faceted effort by the Debtor and his proxies to attack the Trustee's actions and business judgment in both of the bankruptcy cases. Morreale Hotels moved to strike the Debtor's intervention for lack of standing. (Docket No. 661 in MH Case.) After another trial, the Court ultimately determined that the Debtor lacked standing to participate in the *Morreale Hotels* Case. (Docket No. 743 in MH Case.) So then, the Debtor started to act through proxies including Sketch Restaurant, LLC ("Sketch Restaurant")[14] to block the proposed sale of the Broadway Property and Colfax Property. (Docket Nos. 672 and 673 in MH Case.) Over the next months, Sketch Restaurant engaged in a robust effort to stop any dispositions including by deposing the Trustee and serving discovery on others, as well as extensive motions practice. (Docket Nos. 703, 704, 710, 723, 729, 731, and 737 in MH Case.) The Debtor and his proxies contended that the proposed sales would not generate sufficient proceeds to pay any unsecured creditors and that the bid procedures would chill bidding.

Throughout it all, the Debtor consistently emphasized the interrelationship between the Individual Case and the *Morreale Hotels* Case. (Docket No. 649 in MH Case.) And, further demonstrating the close alignment of the two bankruptcy cases, the Court recalls that the Debtor appeared in some capacity or another at every hearing (or almost every hearing) in both the *Morreale Hotels* Case and the Individual Case. Issues spilled over between the Individual Case and the *Morreale Hotels* Case constantly, especially in relation to Sketch Restaurant and the Debtor's assertions of ownership of personal property. (Ex. 31.)

In any event, Morreale Hotels (managed by the Trustee) filed an amendment to the Sale Motion on September 17, 2015. (Docket No. 795 in MH Case; Stip. Ex. 11.) Thereafter, Morreale Hotels submitted executed proposed stalking horse bid contracts. (Docket No. 798 in MH Case; Stip. Ex. 12.) Later, Morreale Hotels filed an Amended Bid Procedures Motion and Amended Sale Motion on September 24, 2020. (Docket

---

[14]     The Debtor acted as the Manager of Sketch Restaurant. At one time, the Debtor wholly owned the entity. However, on the eve of filing the Individual Case, he purported to transfer partial ownership to his fiancé. *See e.g. Connolly v. Palmer (In re Morreale)*, Adv. Pro. No. 15-1240 TBM (Bankr. D. Colo.). Thereafter, the Debtor used Sketch Restaurant against the Trustee even though the Individual Case estate owned the majority of the equity in the company.

Nos. 821-823 in MH Case.)  The Court conducted an evidentiary hearing on October 9, 2015.  (Docket No. 837 in MH Case.)  On October 13, 2015, the Court approved the Bid Procedures and set an Auction for December 3, 2015.  (Docket No. 838 in MH Case.)

To facilitate the sale, the Chapter 7 Trustee filed a motion to sell the personal property located at the Broadway Property.  (Docket No. 555; and Docket No. 843 in MH Case.)  Sketch Restaurant continued to resist.  The morning of the scheduled auction for the Broadway Property, Sketch Restaurant requested that the auction be delayed so that the Court could adjudicate the Debtor's "Motion to Pay Claims in Full and to Dismiss Chapter 7 Case" filed in the Individual Case.  (Docket No. 591; Docket No. 895 in MH Case).  Thus, the Debtor constantly played the Individual Case against the *Morreale Hotels* Case and vice-versa.  Notwithstanding Sketch Restaurant's and the Debtor's efforts to derail the sale, the Broadway Property auction was conducted on December 3, 2015 resulting in a high bid of $6,550,000.  (Docket No. 898 in MH Case.)  The Court authorized the sale of the Broadway Property to Digital Cowboy, LLC on December 4, 2015.  (Docket No. 905 in MH Case.)  Subsequently, Morreale Hotels filed a renewed Motion to sell the Colfax Property on February 19, 2016.  (Docket Nos. 942 and 944 in MH Case.)  Thereafter, the Court approved the sale of the Colfax Property to Inspire Colfax, LLC for $3,550,000.  (Docket No. 969 in MH Case.)  Thus, the Trustee (with BHFS' help) garnered $10,100,000.00 for properties that the Debtor and Morreale Hotels previously had valued at about $646,396.00.

The sales of the Broadway Property and the Colfax Property made it possible for the Trustee to pay all creditors in both the *Morreale Hotels* Case and the Individual Case. Under the Trustee's management, Morreale Hotels submitted Amended Plans Reorganization which proposed distribution of the proceeds received from the sale of the Broadway Property and the Colfax Property.  (Docket Nos. 922, 977 and 980 in MH Case.)  The Debtor objected (Docket No. 973) and the Court conducted another trial. (Docket No. 987 in MH Case.)  On May 18, 2016, the Court issued a Confirmation Order requiring further changes.  (Docket No. 1011 in MH Case; JM Ex. S.)  A few weeks later, the Court confirmed an Amended Plan of Reorganization in the *Morreale Hotels* Case.  (Docket Nos. 1015 and 1017 in MH Case, the "Confirmed Plan"; JM Ex. T and JM Ex. U.)

By all objective measures, the *Morreale Hotels* Case was a resounding success. The Trustee, acting as Manager of Morreale Hotels, distributed $8,432,273.80 and paid all creditors in full, plus interest.  Furthermore, Morreale Hotels disbursed a surplus of $1,089,976.50 to the Individual Case estate.  The *Morreale Hotels* Case was closed on June 16, 2017.  (Docket No. 1080 in the MH Case.)  The Trustee's supervision and management in the *Morreale Hotels* Case, bolstered by strong market conditions, made it possible to pay all the creditors in the Individual Case.  (JM Ex. P.)  Furthermore, the Trustee disbursed $200,000 to the Debtor on an interim basis.  (*Id.*)

      c.    **BHFS' Work Pertaining to the *Morreale Hotels* Case.**

Given the close relationship between the Individual Case and the *Morreale Hotels* case, it is no surprise that BHFS performed work related to the *Morreale Hotels* Case even though Morreale Hotels also had its own separate Chapter 11 legal counsel. After all, BHFS represented the Trustee who himself was the Manager of Morreale Hotels. The Trustee testified that it was often necessary to coordinate activities as between the Individual Case and the *Morreale Hotels* Case. Just so.

The UST identified a discrete set of 32 daily BHFS time entries — totaling $32,734.00 — which the UST contends should not be allowed because such work allegedly was for the *Morreale Hotels* Case and did not benefit the Individual Case. (Stip. Ex. 10.) The Debtor's challenge to BHFS' time entries is much more expansive. The Debtor contends that $69,202.50 in fees should be rejected as "time spent by BHFS on the [*Morreale Hotels* Case]." (Stip. Ex. 5.) In another place, the Debtor suggested that $105,783.50 should be rejected on the same basis. (Debtor's Obj. at 7.) The Debtor also identified contested BHFS daily time entries, but a lot more (129 entries) than the UST identified. The lists presented by the UST and the Debtor have some overlap. But not all the entries contained on the narrower UST itemization are part of the Debtor's list. The differences in the various lists posed by the UST and the Debtor highlight the inherent difficulty in trying to parse when BHFS allegedly performed work "in the *Morreale Hotels* Case" rather than in the Individual Case.

The Court has carefully reviewed the offending time entries advanced by the UST and the Debtor. The Court finds that the Debtor's list is far too broad in characterizing the work performed as relating only to the *Morreale Hotels* Case. A few examples illustrate the point. The Debtor objects to Mr. Pankow's .4 hour time entry on December 23, 2015 for "telephone conference with Tom Connolly re strategy for winding down case." (Stip. Ex. 5.) That seems like a laudable topic and does not appear to be about the *Morreale Hotels* Case at all. The Debtor objects to Mr. Kidder's entry of 1.8 hours on December 28, 2015 for "draft objection to anticipated motion to compel production of trustee forms 1 and 2." (Stip. Ex. 5.) But, BHFS represented the Trustee and Forms 1 and 2 are for the Individual Case. So, there should be no problem rendering legal service pertaining to production of documents from the Trustee.

The Debtor also disputes about 34 time entries concerning removal of personal property from the Broadway Property and the Debtor's access to the Broadway Property. (Stip. Ex. 5.) The Debtor seems to imply that BHFS should not have been involved and such matters pertained only to the *Morreale Hotels* Case. Perhaps the confusion is that the Debtor and so many of his proxies were claiming that they owned so many various types of personal property located inside the Broadway Property.

On November 10, 2015, the Debtor amended his Schedule C in the Individual Case and asserted for the first time that he owned a very large quantity of exempt personal property, including "stock in trade, supplies, fixtures, maps, machines, tools, electronics, equipment, books and business materials" located at the Broadway

Property and Colfax Property. (Docket No. 578; Ex. 32.) Sketch Restaurant claimed to own personal property at the Broadway Property too. The volume of such personal property constituted many large truckloads. It was evident that the Debtor and his proxies were trying to assert such claims to derail the proposed sale of the Broadway Property. However, the Trustee filed Motions to sell personal property in both the Individual Case and the *Morreale Hotels* Case. (Docket No. 555; and Docket No. 843 in MH Case.) The Debtor objected in the Individual Case. (Docket No. 571.) Sketch Restaurant also objected in the Individual Case. (Docket No. 572.)

Meanwhile, there were parallel proceedings involving the personal property located in the Broadway Property in the *Morreale Hotels* Case too. (Docket Nos. 843, 854, and 880 in MH Case.) The Debtor and Sketch Restaurant filed various lists asserting their ownership of personal property in the Broadway Property. (Docket No. 869 in MH Case.) But, of course, any of the Debtor's personal property located in the Broadway Property would have been property of the estate in the Individual Case. The Trustee held a majority interest in Sketch Restaurant. So, to the extent Sketch Restaurant purported to claim ownership of the personal property, those matters were very much part of the Individual Case and BHFS needed to be involved.

The shenanigans concerning who owned what personal property simply demonstrate the cross-over between the two bankruptcy cases, the efforts to which the Debtor and his proxies went to derail the sales, and the impossibility of considering either bankruptcy case as its own silo. Furthermore, as a representative of the Trustee, it was incumbent on BHFS to monitor progress in the *Morreale Hotels* Case. So, the Debtor's contention that the BHFS work can be cabined to the *Morreale Hotels* Case alone is vastly overstated.

Notwithstanding that the Debtor has overplayed his hand (and he certainly asserted his interests in the *Morreale Hotels* Case at every opportunity), some of the time entries listed by the Debtor and the UST give the Court pause. For example, BHFS charged for: "draft addendum to motion to sell Broadway and Colfax properties in Hotels BK case"; "draft amended and restated sale motion re Broadway and Colfax Properties"; "draft superseding sale motion and bid procedures order"; "draft sale order re Broadway sale motion"; "work on proposed Broadway sale order"; "coordinate scheduling phase 11 environmental review at 101 Broadway"; "review title materials"; "assist with sale issues [for Broadway Property]"; "review bids [for Broadway Property]; "attend sale hearing"; "draft [Morreale Hotels] plan revisions impacting Chapter 7 estate"; "draft [Morreale Hotels] disclosure statement insert"; "assist with Broadway closing"; "coordinate re [Broadway Property] closing in L. Kutner's absence"; and "draft plan [Morreale Hotels] plan revisions." (Stip. Exs. 5 and 10.) The UST focused on these type of time entries in asking that BHFS' compensation be reduced by $32,734.00. The Court refers to these type of time entries as the "Questionable Entries."

27

Clearly, BHFS did substantial work related to the *Morreale Hotels* Case, including taking an active role in the sale process for the Broadway Property and the Colfax Property as well as drafting portions of the Confirmed Plan in the *Morreale Hotels* Case. Given the UST Objection and the Debtor's Objection, the Court must consider whether such work (*i.e.,* the Questionable Entries) benefited the estate in the Individual Case and whether the charges were reasonable. These are tough issues in extremely unusual circumstances. Neither BHFS, the Debtor, nor the UST has referred the Court to any precedent that is directly on point which involves two such closely related bankruptcy cases.

With respect to benefit, the Court concludes that the services performed by BHFS and listed in the Questionable Entries benefited the estate in the Individual Case — directly and indirectly. The Debtor's equity interest in Morreale Hotels was the Debtor's largest asset. The Trustee and BHFS were focused on liquidating property to pay the Individual Case creditors. To do so, the Trustee took control of Morreale Hotels. BHFS assisted in the sale process for the Broadway Property and the Colfax Property at the Trustee's request. BHFS did not take the lead because Morreale Hotels was represented by another law firm (Kutner Brinen) and BHFS was not authorized to represent Morreale Hotels. But, neither was there any prohibition against BHFS assisting on limited matters to try to unlock value and pay all creditors where the overlap between the cases was clear. The claims in the Individual Case and the *Morreale Hotels* Case overlapped. So, if creditors could be paid in the *Morreale Hotels* Case, that would benefit the estate in the Individual Case by reducing the claims pool. That is what happened.

As the Trustee's counsel, BHFS had a role to play in the Morreale Hotels reorganization process too. 11 U.S.C. § 1109. BHFS "provided input" in drafting portions of the Confirmed Plan for the *Morreale Hotels* Case. Again, it did not take the lead. But BHFS should have been involved given the impact on the Trustee and the Individual Case. The Trustee in the Individual Case held all the equity in Morreale Hotels. So, BHFS needed to participate an ensure any surplus from the *Morreale Hotels* Case flowed to the estate in the Individual Case.

The Court is firmly convinced that BHFS' work (including the Questionable Entries) benefited the Individual Case estate. So, BHFS meets the initial "benefit to the estate" hurdle under Section 330(a). *See Lederman Enters.,* 997 F.2d at 1323 ("the beneficial nature of legal services must be determined before a reasonableness inquiry may even be conducted."). However, there is little doubt that the same work also benefited the estate in the *Morreale Hotels* Case too. In his testimony, Mr. Pankow conceded that BHFS' services provided "incidental benefit" to the estate in the *Morreale Hotels* Case. But the fact that the same work benefited two parties does not negate that BHFS provided real value and benefit for the estate in the Individual Case. Instead, the dual benefit suggests that an equitable apportionment of attorneys' fees between the two benefited estates might be appropriate. That is what typically happens when a single law firm represents two debtors in jointly administered and complex Chapter 11

28

cases: the law firm tries to divide or apportion the expense on some rational basis. And, that all starts to sound like a reasonableness inquiry.

Under the special and unique circumstances of this case, the Court concludes that the Individual Case estate should not be charged for all the Questionable Entries since the work benefited two parties. The Court bears in mind that under normal circumstances, if attorneys' fees are allocated between two parties, the law firm may recover a proportional share from them both. However, BHFS was never approved to represent Morreale Hotels and the *Morreale Hotels* Case has been closed for years. So, if there is an allocation between the Individual Case and the *Morreale Hotels* Case, what that really means is that BHFS will be unable to recover anything from the Morreale Hotels estate. Nevertheless, to satisfy reasonableness and equity concerns, the Court, in its discretion, elects to allocate only 50% of the Questionable Entries to the Individual Case estate. The Court utilizes the narrower calculation of the amount of Questionable Entries advanced by the UST: $32,734.00. Multiplying by 50% results in a reduction of $16,367.00 in the amount requested by BHFS in the Applications.

### 3.   **BHFS' Work on the IRS Claim Benefited the Estate and Was Reasonable.**

The Debtor (but not the UST) complains that the compensation requested by BHFS in the Applications should be reduced because BHFS' work in relation to the Internal Revenue Services' (the "IRS") Proof of Claim No. 2 (the "IRS Claim") did not benefit the bankruptcy estate. (Debtor's Obj. at 12-15.) Instead, the Debtor contends that the Trustee and BHFS actively colluded with the IRS to "persuade the IRS to inflate its claim to unreasonable levels." (*Id.*) Accordingly, the Debtor requests that BHFS' compensation be reduced by $91,688.00, which amount is the Debtor's calculation of the value of all the time charged by BHFS dealing with the IRS Claim.

Certain facts pertaining to the IRS Claim are not in dispute. On October 29, 2013, the IRS filed the original IRS Claim (Claim No. 2-1) in the aggregate amount of $92,521.74. (JM Ex. H.) The IRS asserted that a $39,219.29 portion of the IRS Claim was a secured claim. The alleged secured portion was based upon federal income taxes for 2005 and 2007, which were assessed against the Debtor in 2009. In addition to the secured portion of the IRS Claim, the IRS asserted that the remaining $53,302.45 portion of the IRS Claim was entitled to priority under Section 507(a)(8). However, the priority portion of the IRS Claim was only an estimate of federal income taxes for 2010, 2011, and 2012 because the Debtor failed to submit federal income tax returns for 2010, 2011, and 2012. Thus, under the column headed "Date Tax Assessed," the IRS stated "Unassessed-No Return."

The Debtor finally filed his missing federal income tax returns in May 2016 (several years late). On August 12, 2016, the IRS submitted its amended IRS Claim (Claim No. 2-2) in the aggregate amount of $1,119,160.48. (JM Ex. I.) The IRS no longer asserted a secured claim. Instead, the IRS characterized a $724,225.11 portion of the amended IRS Claim as entitled to priority under Section 507(a)(8). Under the

column headed "Date Tax Assessed," the IRS stated "Pending Examination" and explained in a footnote "Proposed Tax Deficiency Determined by Examination of Debtor(s) Tax Returns." In addition to the priority portion of the IRS Claim, the IRS added as a general unsecured claim $394,935.37 for "Penalty to date of petition on unsecured priority claims."

About two months later, the IRS significantly reduced the IRS Claim. On October 18, 2016, the IRS submitted its amended IRS Claim (Claim No. 2-3) in the aggregate amount of $798,233.85. (JM Ex. J.) The IRS characterized a $515,711.22 portion of the amended IRS Claim as entitled to priority under Section 507(a)(8). However, again, the priority portion of the IRS Claim was only an estimate of federal income taxes for 2010, 2011, and 2012. Under the column headed "Date Tax Assessed," the IRS stated "Pending Examination." In addition, the IRS reduced to $282,522.63 its general unsecured claim for "penalty to date of petition on unsecured priority claims."

About five months later, the IRS significantly reduced the IRS Claim yet again. On March 23, 2017, the IRS submitted its amended IRS Claim (Claim No. 2-4) in the aggregate amount of $527,587.12. (JM Ex. K.) The IRS characterized a $339,194.40 portion of the amended IRS Claim as entitled to priority under Section 507(a)(8). However, the priority portion of the IRS Claim was only an estimate of federal income taxes for 2010, 2011, and 2012. Under the column headed "Date Tax Assessed," the IRS stated "Pending Examination." In addition to the priority portion of the IRS Claim, the IRS further reduced its general unsecured claim to $188,392.72 for "penalty to date of petition on unsecured priority claims."

About nine months later, the IRS significantly reduced the IRS Claim yet again. On December 26, 2017, the IRS submitted its amended IRS Claim (Claim No. 2-5) in the aggregate amount of $278,185.80. (JM Ex. L.) The IRS characterized a $191,621.00 portion of the amended IRS Claim as entitled to priority under Section 507(a)(8). However, the priority portion of the IRS Claim was only an estimate of federal income taxes for 2011 and 2012. Notably, the 2010 tax year no longer appeared in the IRS Claim. Under the column headed "Date Tax Assessed," the IRS stated "Pending Examination." In addition to the priority portion of the IRS Claim, the IRS reduced the its general unsecured claim to $86,564.80 for "penalty to date of petition on unsecured priority claims."

Two years later, on February 1, 2019, the United States Tax Court issued a "Decision" determining that the Debtor owed the IRS only $32,006.00 for federal income taxes for 2011 and 2012. (JM Ex. D.)

In simplified summary, the IRS Claim ping-ponged as follows during the last seven years of the Individual Case:

| | |
|---|---|
| IRS Claim No. 2-1  (10/29/13) | $     92,521.74 |
| IRS Claim No. 2-2  (08/12/16) | $1,119,160.48 |
| IRS Claim No. 2-3  (10/18/16) | $  798,233.85 |

| IRS Claim No. 2-4 (03/23/17) | $ 527,587.12 |
| IRS Claim No. 2-5 (12/26/17) | $ 278,185.80 |
| Tax Court Decision (02/01/19) | $ 32,006.00 |

The foregoing changes to the IRS Claim appear at first blush to be quite disconcerting. However, there is an elementary reason underlying the changes: the Debtor neglected to file his federal income tax returns for 2010, 2011, and 2012 until May 2016. The manner in which the Debtor had structured his financial affairs and those of his various entities, including Sketch Restaurant and Morreale Hotels, along with the absence of reliable records, complicated the analysis and quantification of his tax liability. Thus, the original IRS Claim was nothing more than a "placeholder." When the Debtor finally got around to filing his federal income tax returns many years after the deadline most Americans abide by, his late returns prompted an extensive examination by the IRS. So, rather obviously, the main blame for delay in determining the Debtor's federal income tax liability lies with the Debtor. Indeed, the Debtor also failed to file tax returns and pay taxes during the early stages of the Individual Case. Such endemic failure to file tax returns and pay taxes was a principal reason why the Individual Case was converted from Chapter 11 reorganization to Chapter 7 liquidation. (Docket No. 310 at 91.)

The Debtor sees it otherwise. He blames the Trustee and insists that somehow the Trustee and BHFS colluded with the IRS in an evil scheme to artificially inflate the IRS Claim. There is no evidence whatsoever to support the Debtor's surmise. None. Instead, the evidence elicited at trial shows that the Trustee and BHFS rightly were concerned that they could not administer and close the Individual Case unless and until there was a determination of the Debtor's federal income tax liability. The Trustee testified credibly that he encouraged the Debtor to file the Debtor's federal income tax returns for 2010, 2011, and 2012 as soon as possible. The Debtor did not do so until 2016.

After the Debtor finally filed the delinquent federal income tax returns, the Trustee and BHFS started to focus on resolving the IRS Claim. Meanwhile, there was another complication. On April 15, 2016, the IRS notified the Trustee that the Chapter 7 Estate was "selected for examination." (Ex. 52.) In the two-year period from 2016 to 2018, BHFS billed approximately $85,885.00 for time spent in connection with the IRS Claim.[15] BHFS communicated with the Trustee, the Trustee's accountant, the IRS, and the Debtor's counsel about the IRS Claim. Neither the Trustee nor BHFS had any role in causing the IRS to increase the IRS Claim from $92,521.74 to $1,119,160.48. Instead, the evidence demonstrates that the Trustee was "surprised" by the increase

---

[15]    The Court's $85,885.00 calculation is derived from the Third Application, Stip. Ex. 3, and Stip. Ex. 8. The Debtor advances a higher number: $91,688.00. However, the Debtor's calculation is inflated in at least two ways. First, the Debtor assumes that all $80,269.50 of compensation requested by BHFS for the category "Claims Administration" pertains exclusively to the IRS Claim. It does not. Instead, multiple charges in this category relate to resolution of other claims. Second, the Debtor contends that all the charges listed on Stip. Ex. 8 are "hidden time" spent by BHFS on the IRS Claim. However, several of the listed time entries are not limited to the IRS Claim. Thus, the Court's computation is somewhat less than the Debtor's computation.

and testified that he thought it was "too high."  Thereafter, the Trustee and BHFS tried to reduce the IRS Claim to ensure that it was "the right number."  The Debtor also objected to the IRS Claim and worked separately to reduce the IRS Claim.  (Docket No. 905.) The Trustee's role was hampered, at least to some extent, because the Debtor did not provide all his records to the Trustee.

In any event, by the summer of 2017, the Trustee concluded that it would be best to force a resolution of the IRS Claim so that final distributions could be made and the Individual Case closed.  So, on June 2, 2017, BHFS drafted and filed the "Trustee's Motion for Determination of Debtor's Prepetition Tax Liability Pursuant to Bankruptcy Code Section 505(a) and for Authority to Pay Non-Penalty Portion."  (Docket No. 832 and Ex. 43, the "505 Motion.")  The Trustee's goal was to quantify and fix the amount of the IRS Claim.  The Trustee recited that he did not have "a great deal of the financial information debtor gave to the IRS."  The Trustee's testimony at trial verified that point. In any event, based upon the information that the Trustee did have, recommendations of his tax accountant, and communications with the IRS and the Debtor, the Trustee sought to allow amended IRS Claim No. 2-4 in the amount of $527,587.12.  In the 505 Motion, the Trustee stated:  "The Trustee does not seek any particular outcome, but needs the correct number fixed so he can wrap up the [Individual Case]."  Again, that point was verified by the Trustee's testimony at trial.

Ultimately, the 505 Motion along with the Debtor's own objections to the IRS Claim had the salutary effect of forcing further exchange of information and a resolution of the IRS Claim.  About six months after the filing of the 505 Motion, the Trustee, the IRS, and the Debtor agreed to resolve the IRS Claim in the Individual Case by submitting a "Joint Motion to Approve Stipulation Regarding Proof of Claim No. 2-5 Filed by the Internal Revenue Service."  (Docket No. 918; Ex. 44, the "Tax Stipulation.") Under the Tax Stipulation, the parties agreed that the Trustee would deposit with the IRS the full amount of the most-recent amended IRS Claim No. 2-5: $278,185.80. However, the Debtor and the IRS agreed to resolve actual tax liability outside of bankruptcy in the United States Tax Court.  Under the terms of the Tax Stipulation, the Debtor would receive any refund from the $278,185.80 deposit based upon a favorable adjudication.  And, that is what happened.  The Debtor succeeded in further reducing the IRS Claim to $32,006.00 and received the surplus from the deposit (about $246,179.80).

Through all the foregoing, BHFS capably served the Trustee and the interests of the bankruptcy estate.  The Debtor's principal objection to the compensation requested in the Applications pertaining to the IRS Claim is that the Trustee and BHFS acted counterproductively to inflate the IRS Claim.  Again, there is no evidence at all to support such an assertion.  Instead, BHFS' work assisted in a result beneficial to the bankruptcy estate in the Individual Case despite the delays and obfuscation of the Debtor pertaining to taxation issues.  So, no reduction to BHFS' compensation request is warranted for claims administration.  The Court finds the fees requested in this category to be reasonable.

4.    **Most of BHFS' Work on the *Digital Cowboy* Issue Benefited the Estate and Was Reasonable.**

Unbeknownst to the Trustee, in 2018, the Debtor started a lawsuit in the State Court captioned:  *Morreale v. Digital Cowboy, LLC et al.*, Case No. 2018-CV-34457 (Dist. Ct., Denver, Colo.) (the "*Digital Cowboy* Action").  Through the *Digital Cowboy* Action, the Debtor asserted claims for fraud and breach of contract against the successful purchaser of the Broadway Property at the auction conducted in the Court on December 3, 2015 in the *Morreale Hotels* Case based upon an alleged side deal.  (Ex. 59.)  The Debtor did not sue the Trustee.

However, as part of the discovery process in the *Digital Cowboy* Action, in 2020, the defendants and the Debtor sought to obtain discovery from the Trustee and BHFS.  This was the first that the Trustee and BHFS learned of the *Digital Cowboy* Action.  Thereafter, the Debtor served subpoenas on the Trustee and Mr. Pankow requesting wide-ranging production of documents.  (Exs. 62 and 63.)  The Trustee and Mr. Pankow also were noticed for depositions in the *Digital Cowboy* Action.

Given the requests, the Trustee and BHFS sought additional information concerning the nature of the *Digital Cowboy* Action.  BHFS obtained copies of the Debtor's "Responses to Defendant Digital Cowboy's First Set of Discovery Requests" and "Rule 26(a)(2)(B)(II) Disclosure of Witnesses."  (Exs. 60 and 61.)  In one of the submissions, the Debtor appeared to attack the Trustee and stated: "the trustee should have reasonably requested that the high bidder/lender adhere to the loan commitment, as opposed to actively colluding with the high bidder/lender to evade the loan commitment."  (Ex. 61 at 3.)  The Court never received any evidence of the Trustee "actively colluding" with anyone.  In any event, the Debtor's allegation caused the Trustee concern.  BHFS also discovered that the Debtor had reinstated Morreale Hotels with the Secretary of State of Colorado contrary to the terms of the Confirmed Plan and the Trustee's dissolution of Morreale Hotels.  (Ex. 65 and JM Ex. T (providing that all member interests in Morreale Hotels would be cancelled).)

Given the foregoing, the Trustee requested that BHFS bring the matter to the Court's attention and enforce the automatic stay in the Individual Case to bar discovery against the Trustee and BHFS without approval of the Court.  *See Barton v. Barbour*, 104 U.S. 126 (1881) (a party seeking to sue a federal receiver for actions taken in that capacity must first seek permission from the federal court supervising the receiver); *Satterfield v. Malloy*, 700 F.3d 1231 (10th Cir. 2012) (extending *Barton* doctrine to bankruptcy trustees).  Thus, BHFS prepared and filed a "Motion to Enforce *Barton* Doctrine, to Enforce the Automatic Stay, and For Related Relief" on May 27, 2020. (Docket No. 1048 and Ex. 58, the "*Barton* Motion.")  The Debtor objected to the *Barton* Motion.  (Docket Nos. 1056 and 1060.)  The Court conducted a hearing, heard the arguments of the parties and took the matter under advisement.  (Docket No. 1063.) However, prior to the Court issuing a decision, the Trustee and the Debtor filed reports indicating that matters had been resolved and the dispute was moot.  (Docket No. 1071 and 1072.)  BHFS represented the Trustee in a deposition and produced a limited set of

documents.  Mr. Pankow's deposition was cancelled.  So, given the foregoing, the Court denied the *Barton* Motion, without prejudice, as moot.  (Docket No. 1073 and JM Ex. Z.)

Now, the Debtor (but not the UST) objects to BHFS being compensated for any work relating to the *Digital Cowboy* Action and the *Barton* Motion.  The Debtor computed the time spent on these issues as approximately $40,603.18.  (Stip. Ex. 7 at Columns "Digital" and "Barton Digital.")  BHFS did not dispute the computation of the fees sought for work related to the *Digital Cowboy* Action ($9,496.50) and the *Barton* Motion ($31,106.68).  The Court also has reviewed the time entries in the Final Application and concurs that the Debtor's computation is valid.  So, the question boils down to whether BHFS' $40,603.18 in recent work on matters involving the *Digital Cowboy* Action and the *Barton* Motion is compensable as being of benefit to the Individual Case bankruptcy estate.

The issue is unusual in that all the creditors in the Individual Case and the *Morreale Hotels* Case already had been paid in full plus interest by the time BHFS performed the work for the Trustee.  So, BHFS' work did not benefit creditors.  And, BHFS' assistance did not benefit the Debtor.  Instead, the Debtor opposed the *Barton* Motion and now contests all compensation requested by BHFS.

Nevertheless, the Court concludes that benefit to the estate under Section 330 also includes protecting the legitimate interests of the Trustee of the Individual Case estate and the bankruptcy process.  That is what BHFS was doing.  The Trustee is still in place and the Individual Case is still open.  The Debtor initiated the *Digital Cowboy* Action and accused the Trustee of malfeasance related to the auction process.  Thus, the defendants in the *Digital Cowboy* Action requested discovery from the Trustee and BHFS who was involved in monitoring the Trustee's interests in the sale process.  The Debtor then sought to burden the Trustee with written discovery and a deposition all because of the Trustee's administration in the Individual Case.

Under these circumstances, the Trustee was entitled to have his court-approved professionals assist him — especially since the Debtor suggested that the Trustee engaged in malfeasance.  BHFS did what was asked and defended the Trustee.  The work performed included preparing and filing the *Barton* Motion.  The *Barton* Motion raised difficult and novel issues.  Then, BHFS negotiated and achieved a resolution.  BHFS assisted the Trustee in making a limited document production to the Debtor and the defendants in the *Digital Cowboy* Action.  The parties dropped their request to depose Mr. Pankow.  And, then BHFS defended the Trustee in his deposition.  The work assisted in bringing the dispute to a conclusion so that the Individual Case may be closed.  It generally benefited the Trustee and the bankruptcy process.

Despite the benefit to the Trustee and the bankruptcy process, the amount of time spent on the *Barton* Motion is high.  At the hearing held on the *Barton* Motion (Docket No. 1063), the Court raised concerns with the Trustee and BHFS about the legal bases for the *Barton* Motion.  To ensure a reasonable fee for the Barton Motion services billed, the Court elects in its discretion to reduce compensation in this category

by $10,000 (which is about 32% of the *Barton* Motion category of fees requested and approximately 25% of the total $40,603.18 requested pertaining to the *Digital Cowboy* Action).

### E. Further Analysis of Reasonableness of BHFS' Fees and Expenses.

In addition to analyzing the foregoing specific issues raised by the Debtor[16] and the UST concerning benefit to the estate, the Court also considers the overall reasonableness of the fees and expenses sought by BHFS.

### 1. Reasonableness of Time Spent by BHFS:  Sections 330(a)(3)(A) and *Johnson* Factor No. 1.

#### a. Overall Reasonableness of the Time Spent.

Throughout the six-year engagement representing the Trustee in the Individual Case, BHFS clocked around 1,768 hours of legal services.  In order to determine the reasonableness of the number of hours billed by BHFS, at least a short walk through the history of BHFS' representation of the Trustee is necessary

BHFS was engaged shortly after the Individual Case was converted from Chapter 11 to Chapter 7 and Mr. Connolly was appointed as Trustee.  During the initial period after its retention, BHFS assisted the Trustee in investigating the assets and liabilities of the Debtor and securing various assets including a brokerage account, other financial accounts, real properties, and membership interests in a variety of entities such as: Morreale Hotels; Stanzi, LLC d/b/a La Rumba ("Stanzi"); Hotel Restaurant, LLC d/b/a Rockbar ("Rockbar"); and Juarez Restaurant, LLC d/b/a Mezcal ("Juarez").

The Trustee exercised his business judgment and promptly commenced efforts to liquidate the Debtor's assets for the benefit of creditors consistent with Section 704(a) ("The trustee shall collect and reduce to money the property of the estate . . . .").  BHFS

---

[16]     The Debtor also posed objections to BHFS' charges for preparing its Final Application and for filing the Trustee's "Application to Re-Employ ACM LLP as Tax Accountant" (Docket No. 1065, the "ACM Application").  The Court has considered these objections and rejects them.

BHFS charged about $8,222.25 for preparation of the Final Application.  (Docket No. 1086 at 17.) Mr. Pankow charged most of the time for the project.  BHFS knew going into the filing of its Final Application that the Debtor would object.  Thus, it was appropriate for Mr. Pankow to spend the majority of time preparing the Final Application rather than delegating the duty to a more junior attorney.  Mr. Pankow had lived the case for six years and had the greatest familiarity with the services provided.  While the Court acknowledges that the amount charged is somewhat high, the amount is not unreasonable. And, fee application preparation generally is compensable.  11 U.S.C. § 330(a)(6).

In 2020, the Trustee determined that he could obtain an additional tax refund based on recent changes in tax law.  Such a refund would benefit the estate and the Debtor.  So, the Trustee sought to re-employ the accountants who had assisted him earlier in the Individual Case.  BHFS assisted.  The Debtor objected and the Court convened a hearing.  At the hearing, the Debtor declared that he did not want the refund and confirmed that he would not challenge the Trustee for failing to recover the refund.  On that basis, the matter was resolved.  However, BHFS' activities in such matter were necessary and intended to benefit the estate and protect the Trustee in the performance of his duties.  The amount charged was reasonable.  Thus, the Court rejects the Debtor's challenge to the fees charged by BHFS for the ACM Application (about $4,410.00).

helped liquidate a brokerage account (Docket Nos. 404 and 405) and sell the Debtor's interests in Stanzi (Docket Nos. 370, 433, and 486) and Juarez (Docket Nos. 368, 433, and 485).  What should have been a fairly simple exercise for the Trustee was aggressively contested by the Debtor over many months.  The sale of the Debtor's interests in Stanzi and Juarez required a trial on the Debtor's standing.  *See Morreale*, 2015 WL 3897796.

The early standing issue in connection with the sales of the Stanzi and Mezcal membership interests is indicative of what happened throughout the Individual Case. When the Debtor started the Individual Case, he filed his Statement of Financial Affairs and Schedules swearing under oath that he had assets worth $3,623,699.00 as against debts of $7,152,069.  (Docket No. 17.)  He listed his ownership of Stanzi as worth only $24,138.76 and his membership in Juarez as valued at $0.  He repeatedly confirmed his insolvency including in the Morreale Disclosure Statement filed in the Individual Case about a month before conversion to Chapter 7.  (Docket No. 246.)  However, after the Trustee was appointed, the Trustee sought to sell the Debtor's interests in Stanzi for $125,000.00 (instead of the Debtor's own $24,138.76 valuation).  Similarly, the Trustee sought to sell ownership in Juarez for $25,000.00 (instead of the Debtor's own $0 valuation).  One might have expected the Debtor to support such efforts to garner value — value much greater than the Debtor himself projected.  However, the Debtor aggressively objected that the Trustee was not obtaining enough and caused a multi-month delay.  (Docket Nos. 394 and 395.)  Ultimately, the Court concluded that the Debtor did not have standing to raise objections to such sales because the Debtor had repeatedly affirmed that his estate was insolvent and the credible evidence at the time corroborated as much.  *Morreale*, 2015 WL 3897796.  The fight over these relatively modest sales of membership interests in Stanzi and Juarez was a small harbinger of things to come.

Even though the Court determined that the Debtor lacked standing to contest the administration of the Individual Case, the Debtor continued to attack using proxies.  One key proxy was Sketch Restaurant.  That entity was wholly-owned and managed by the Debtor for much of its existence.  However, right before the Debtor filed for bankruptcy protection, he purportedly transferred 30% of his equity interest to his fiancé seemingly for no consideration.  After the appointment of the Trustee, the Debtor continued to assert that he managed Sketch Restaurant.  And then, even though his bankruptcy estate owned 70% of the equity in the company, the Debtor used Sketch Restaurant as a vehicle to object to the Trustee's liquidation efforts in the Individual Case and the *Morreale Hotels* case.  The Debtor's subterfuge with Sketch Restaurant required BHFS to commence an adversary proceeding against Sketch Restaurant to void the purported transfer of equity to the Debtor's fiancé.  And, it certainly necessitated that the Trustee and BHFS spend a lot of time and effort.

After the initial asset sales, the Trustee and BHFS turned their attention to Morreale Hotels.  As noted previously, Morreale Hotels, now an asset of the Individual Case, was itself in bankruptcy.  In his Statement of Financial Affairs and Schedules in the Individual Case, the Debtor asserted that the value of his ownership of Morreale

Hotels was $0. (Docket No. 17.) However, the Trustee was not deterred by that characterization. He stepped in to take control of Morreale Hotels and ultimately realized significant value from Morreale Hotels. The Court already has explained the close relationship between the Individual Case and the *Morreale Hotels* Case. The Court will not repeat it. But, when considering the reasonableness of the work performed by BHFS, it should be noted that the law firm spent significant time and effort to assist the Trustee in unlocking value from Morreale Hotels through sales of the Broadway Property and the Colfax Property. Those efforts were opposed by the Debtor at every step in both the Individual Case and the *Morreale Hotels* Case. Despite the onslaught, the Trustee and BHFS ultimately prevailed. The Trustee sold the Broadway Property and the Colfax Property for the benefit of creditors and the estate in both the *Morreale Hotels* Case and the Individual Case. But, again, it came at a price: substantial expense in terms of attorneys' fees.

In addition to asset dispositions and the Sketch Restaurant adversary proceeding, the Trustee and BHFS also sought to enhance the estate in the Individual Case by carefully scrutinizing the Debtor's claimed exemptions. The Trustee, through BHFS, objected to the Debtor's claim of exemption in an alleged life insurance policy with a cash surrender value of $363,714.51. (Docket No. 360.) The Trustee asserted that the financial instrument was an annuity (not a life insurance policy), so that it was not exempt. The Debtor vigorously objected. (Docket Nos. 385 and 562.) With BHFS' help, the Trustee won and the exemption was rejected. (Docket Nos. 734 and 737.)

Later in the Individual Case, the Trustee and BHFS directed their attention to creditor claims and payment. As noted previously some of the creditors in the Individual Case were paid by disbursements in the *Morreale Hotels* Case after the Trustee successfully engineered the sale of the Broadway Property and the Colfax Property. In any event, all creditors in both the Individual Case and the *Morreale Hotels* Case were paid in full plus interest. In the later stages of the Individual Case, substantial time and effort was expended on compensation issues for the Trustee and BHFS. And, more recently, BHFS assisted with respect to the *Digital Cowboy* Action.

Throughout the entire Individual Case, the Debtor did almost everything he could — and then some — to derail the Chapter 7 liquidation process. He fought the conversion of the Individual Case to Chapter 7 by appealing. That didn't pan out. *See Morreale v. 2011-SIP-1CRE/CADC Venture, LLC,* 2015 WL 429502. So, then, the Debtor decided to relitigate conversion. Having already lost after a multi-day conversion trial, the Debtor filed a "Motion to Reconvert Case to Chapter 11." (Docket No. 441.) The Trustee contested reconversion. The Court ultimately denied reconversion from Chapter 7 to Chapter 11 (Docket No. 508); but, meanwhile, BHFS was forced to spend significant time and resources defending the Trustee.

Losing the conversion battle did not deter the Debtor. At various other stages of the Individual Case, he sought to oust the Trustee so that he could "pay creditors" and dismiss the case. (Docket Nos. 590, 591, 607, 746, and 791.) BHFS defended the Trustee. The Court ultimately rejected the Debtor's repeated efforts to dismiss the

Individual Case.  (Docket Nos. 659, 660, and 810.)  And, the Debtor contested virtually every administrative action taken by the Trustee.   However, it all came at a cost.  BHFS was called upon to spend substantial time assisting the Trustee.

In determining the reasonableness of time spent, the Court may consider the "maneuvering of the other side." *Ramos v. Lamm*, 713 F.2d 546, 554 (10th Cir. 1983). This is especially important in this dispute over professional compensation.  The Debtor's maneuvering was extensive by any measure.  While the Debtor had certain due process rights and may have been entitled to object to the Trustee's administrative actions (at least after the Individual Case estate became solvent), the Court is convinced beyond any doubt that the Debtor's actions caused a proliferation of administrative expenses.  In the Court's estimation, the Debtor's aggressive litigation against the Trustee (most of which failed) increased BHFS' attorney's fees and costs by a multiple of 3 or 4 times what they would have been otherwise.  The only real exception is the Fee Defense Attorneys' Fees Issue; however, the Court already disallowed all BHFS' Fee Defense Attorneys' Fees.

The foregoing is only a very short summary of some of the history in the Individual Case.  As noted previously, through the Applications, BHFS has divided its time into several typical categories: case administration; asset disposition; asset recovery; exemptions; claims administration; and retention/fee applications.  The Court has carefully reviewed the categories and the time allocated to each category.  The Court also reviewed the supporting BHFS billing statements showing time spent.  In addition, the Court made a rough calculation of the work performed by year as follows:

| | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Percentage of Total Fees By Year: | 36% | 22% | 15% | 11% | 9% | 7% |

The data show that BHFS spent the most time and effort in the early stages of the Individual Case especially in connection with case administration, asset dispositions, and asset recovery.

After all of its own analysis and considering the arguments of the parties, the Court concludes on an overall basis that the time spent by BHFS in representing the Trustee was beneficial to the estate in the Individual Case and reasonable; except with respect to the Fee Defense Fees Issues for which the Court already has disallowed compensation entirely and the reductions already imposed for the *Morreale Hotels* Case and *Digital Cowboy* Action work.  However, for completeness, the Court also separately addresses the objections raised to paralegal time.

### b.   The Paralegal Time Objection and the Reasonableness of Paralegal Services.

BHFS utilized a paralegal, Sheila M. Grisham, to assist the attorneys in performing work for the Trustee.  Ms. Grisham charged approximately 251 hours over the six-year engagement valued at around $65,650.00 according to the Court's calculations.[17]  Her billings constitute about 14% of the aggregate BHFS hours billed and about 8% of the fee billings.  During closing argument, counsel for the Debtor objected to every single minute spent by Ms. Grisham.  The UST's objection was more nuanced.  The UST characterized some of the work Ms. Grisham did as "clerical in nature" and, thus, undeserving of compensation.  Helpfully, the UST itemized the allegedly clerical work by preparing various lists of specific time entries.  (Stip. Ex. 9; containing three lists of Ms. Grisham time entries.)  The UST identified a total of $40,573.50 of Ms. Grisham's time entries which the UST claims are clerical and not compensable: (1) $8,526.00 from the First Application; (2) $11,081.50 from the Second Application; (3) $17,775.00 from the Third Application; and (4) $3,191.00 from the Fourth Application.  Apparently in response to objections, BHFS appears to have voluntarily reduced its request for compensation for Ms. Grisham's paralegal time by about $19,719.00.  (Stip. Ex. 6.)  That reduction already has been made in determining BHFS' final ask for $810,576.13.  Put another way, BHFS already reduced its requested paralegal compensation by about 30% (*i.e.*, from $65,650.00 to $45,931.00).

In the Court's review of the UST Objection and the Debtor's Objection, the two main issues with respect to BHFS' paralegal services are: (1) whether the descriptions of work performed by Ms. Grisham are sufficiently detailed; and (2) whether some of the work performed by Ms. Grisham is purely "clerical" and thus should be part of BHFS' overhead.  The Debtor also argues that none of Ms. Grisham's time can be charged; however, that broad and undifferentiated argument is without any legal merit.  Paralegals are true professionals who often render great value in legal work.  In fact, work by an experienced paralegal often times may be more efficient and economical than similar work performed by a brand-new associate attorney.

With respect to the position that fee application descriptions must be detailed, "[a] proper fee application must list each activity, its date, the attorney [or professional] who performed the work, a description of the work performed or subject matter of the work, and the time spent on the work."  *In re Yankton College*, 101 B.R. 151, 159 (Bankr. S.D. 1989); *see also* Fed. R. Bankr. P. 2016(a).

> The requirement of detail and specificity serves to provide the information needed for the court to decide whether a particular fee or expense is both "actual and necessary." This requirement is not an end in itself and should be enforced in a manner that serves its purpose or function. Consequently, fee applications falling short of the "ideal of completeness" may still be sufficient.

---

[17]   The Court's rough estimate is a little higher than the $59,308.00 calculated by the Debtor.  (Stip. Ex. 6.)

*In re Cascade Oil Co., Inc.*, 126 B.R. 99, 105 (D. Kan. 1991).  For example, "compensation may be allowed for those intermittent entries that lack sufficient detail when they were supported by a reading of the entire application."  *Id.* at 109.

The UST and the Debtor have a point concerning the lack of detail for some of Ms. Grisham's time.  For example, in the specific time entries identified by the UST, the following seemingly generic phrases appear hundreds of times: "review and analyze bankruptcy pleadings," "email exchange with []," "prepare hearing notebooks," "docketing of deadlines."  Ms. Grisham billed about 99 times alone for the endemic "review and analyze bankruptcy pleadings," usually in time increments of .1 to .5 hours. (Stip. Ex. 9.)  Most "review and analyze bankruptcy pleadings" entries were followed shortly thereafter by "email exchange with [ ]" usually in a .1 hour time increment. These types of entries certainly are not very descriptive.  They beg questions such as: What specific pleadings did Ms. Grisham actually review and analyze?  What purpose was served by such review and analysis? Why did Ms. Grisham usually circulate the pleadings to someone else or a group?  Accurate answers to such questions cannot be gleaned merely from the generic text of the entries.

The Court does not encourage or endorse the short-hand used by Ms. Grisham and BHFS.  However, unfortunately, it is not especially unique.  Many fee applications presented to the Court have similar entries.  For example, the Allen & Vellone P.C. law firm (which represents the Debtor in prosecuting the Debtor's Objection against BHFS) submitted fee applications in the Individual Case with paralegal descriptions such as: "prepare hearing notebook," "revise exhibits," "hearing preparation," "conference with [ ]," "pick up boxes from client," "exchange emails with [ ]," "telephone call and meeting," and "review documents." (Docket No. 193.)  Sometimes, the Debtor's own law firm did not even identify the specific paralegal who performed work and just used the anonymous acronym "PAR" to refer to unknown paralegals.  (*Id.*)  With respect to lawyers, the Debtor's counsel who conducted most of the trial, Patrick D. Vellone, regularly billed for "meeting with Client," "meeting with Attorney [ ]," and "telephone conference with [ ]."  (*Id.*)  From these entries, the Court has no way of knowing the real subject matter of the work.  Why did Mr. Vellone "meet with Attorney [ ]" and what was the subject of their discussion?  Mathew M. Wolf, another lawyer for Debtor who presented closing argument disparaging BHFS billing practices himself often billed generically just like Mr. Vellone (even using the same phrases) and occasionally utilized vague descriptions such as "review and analyze the work." (*Id.*)  That begs the questions: What work?  And, why did Mr. Wolf review and analyze it, whatever it was? In fact, Mr. Wolf's "review and analyze the work,"[18] sounds a whole lot like Ms. Grisham's "review and analyze bankruptcy pleadings."

All of this is not to say that just because "everyone else does it" it is fine that most of Ms. Grisham's time entries lack sufficient detail.  But, it does suggest that sometimes the Court may look further than the mere text of time entries.  In BHFS' representation of the Trustee, BHFS needed to monitor all of the filings in the Individual Case and the

---

[18]    In fairness, most of Mr. Wolf's time entries were more descriptive.

*Morreale Hotels* Case.  There were 1,103 docket entries in the Individual Case and an additional 1,092 docket entries in the *Morreale Hotels* Case (albeit that some entries occurred prior to BHFS' retention).  (Exs. 1 and 2.)  During the most active times in both bankruptcies (primarily 2015-2016), there frequently were multiple filings made in the same day.  The paper flow seemed unceasing.

At trial, Mr. Pankow explained how BHFS managed its work and used Ms. Grisham as a "gate-keeper."  She reviewed every pleading filed in the Court's ECF system in the Individual Case and *Morreale Hotels* Case.  She had responsibility to manage the pleadings flow and decide who at BHFS should be informed of which filings.  Then, she e-mailed the Trustee, specific BHFS attorneys, or the entire "team" to ensure that there was proper coordination and attention to pressing issues.  In this context and as explained by Mr. Pankow, it might not be as strange to observe that Ms. Grisham described her work as "review and analyze bankruptcy pleadings" at least 99 times.  Such work is generally compensable.  *See In re CF&I Fabricators of Utah, Inc.*, 131 B.R. 474, 491 (Bankr. D. Utah 1991) ("analyzing incoming documents . . . and routing the documents" is compensable).

June 5, 2015 was a typical day and is a good illustration (randomly selected by the Court) of what Ms. Grisham did.  On that day, there were four filings in the Individual Case: (1) "Motion to Pay Creditors by Tom H. Connolly" (Docket No. 496); (2) "L.B.R. 9013-1.1 Notice" (Docket No. 497); (3) "Certificate of Service" (Docket No. 498); and (4) "Stipulation for the Approval of Settlement Regarding the Final Application for Approval of Attorneys' Fees and Costs of Allen & Vellone, P.C. and the Second and Final Application for Allowance of Compensation and Reimbursement of Expenses of Weinman & Associates, P.C. and the United States Trustee's Objections Thereto." (Docket No. 499).  Ms. Grisham recorded the following time entry:

> Review and analyze bankruptcy pleadings (.2); email
> exchange with working group re same (.2) docket deadline
> (.1)

Based on Mr. Pankow's unrebutted testimony, Ms. Grisham's role was to review all the pleadings.  She could have listed the very long titles to the four pleadings in her time entries.  Perhaps, she could have summarized the four pleadings in a short fashion such as "reviewed and analyzed motion to pay, notice, certificate of service, and stipulation re: settlement on attorneys' fees."  Maybe it would have been better to refer to the pleading by docket numbers.   But she just described her work generically as "reviewed and analyzed bankruptcy pleadings."  Then she circulated some or all the "bankruptcy pleadings" to a BHFS working group.  And, finally, she docketed a deadline (presumable from the L.B.R. 9013-1.1 Notice).  It all took half an hour — which seems entirely reasonable and maybe even less time than would ordinarily be expected.  But, both the UST and the Debtor ask that BHFS receive nothing for this work because the June 5, 2015 time entry is not descriptive enough.

The Court recognizes that too many of Ms. Grisham's time entries were too generic and urges all BHFS personnel (paralegals included) to include more fulsome descriptions of materials reviewed and analyzed. It should not be the job of the Debtor, creditors, the UST, and the Court to have to ferret through the time entries and then compare the time entries to the docket sheet and actual pleadings in order to assess the reasonableness of the work performed. However, the Court is familiar with most of the work since the Court itself also "reviewed and analyzed pleadings" in the Individual Case and the *Morreale Hotels* Case most business days in 2015 and 2016. The Court has spent enough time comparing Ms. Grisham's time records to the docket record to know that even though the text of the entries is generic, the work lines up with the record of the Individual Case and the *Morreale Hotels* Case in almost every instance. But during cross-examination of Mr. Pankow at trial, the UST identified a few instances of Ms. Grisham's time entries that did not seem to match some record activity in the Individual Case. In some of the illustrations, the UST ignored activity in the *Morreale Hotels* Case. After reviewing the various examples highlighted by the Trustee, the Court concludes that Ms. Grisham's generic "reviewed and analyzed pleadings" and "emailed to [ ]" time entries on May 16 and 18, 2015, June 22, 2015, October 26, 2016, and November 3, 2016, should be rejected because they do not match events occurred in either the Individual Case or the *Morreale Hotels* Case. Even Mr. Pankow acknowledged that there could have been a mistake in such billing examples. Together, the suspect entries total 1.8 hours of paralegal time and should not be compensable. The Court disregards the other examples identified by the UST at trial because there were some events occurring around the time of the billings in either the Individual Case or the *Morreale Hotels* Case.

In addition to objecting to the generic time entries submitted by Ms. Grisham, the Debtor and the UST also object that much of the work performed by Ms. Grisham was "clerical in nature" and not compensable. In focusing on the "clerical in nature" objections, the Debtor and the UST point out that Ms. Grisham billed for tasks such as: "filing" pleadings through the Court's ECF docket system; "docketing of deadlines"; "calendaring of deadlines"; "preparing hearing notebooks"; and "preparing hearing notebooks for trial." And, as discussed above, Ms. Grisham performed the gatekeeping function when she "reviewed and analyzed bankruptcy pleadings" generally followed by an email distribution.

In the Court's view, the UST's itemization of objectionable ministerial tasks is far too broad and undifferentiated. For example, the UST objects to paralegal time entries such as: July 27, 2015 "prepare certificate of service and affidavit of service of summons and complaint on C. Palmer (.6)"; May 4, 2018 "revise appellant's designation of record (1.6)"; June 22, 2018 "revise Trustee's Response to Debtor's Objection to Claim No. 5-2 (.3)"; and August 3, 2018 "prepare exhibits for appendix and addendum to brief (11.4)." Why are these type of tasks "clerical in nature" and thus uncompensable? Neither the UST nor the Debtor explained. In the Court's view, such types of tasks are the very heartland of appropriate paralegal work which is compensable. And, what exactly is wrong with a paralegal "preparing hearing notebooks"? Counsel for the Debtor, Allen & Vellone P.C., had its own paralegals

42

regularly bill for "prepare exhibits"; "prepare hearing notebook"; "prepare exhibit notebooks for hearing" and the like.  (Docket No. 193.)  The Debtor did not object to Allen & Vellone P.C.'s charges; but now the Debtor seems intent that BHFS cannot charge for the same type of services.  The Court disagrees.

The Debtor and the UST tried to clarify what type of work is clerical by citing the *CF&I Fabricators* decision for the proposition that "typing, data entry, checking court dockets or court dates, manually assembling, collating, marking, processing, photocopying, or mailing documents . . . is clerical in nature and not compensable. Such tasks are traditionally charged to overhead and included in the professional's hourly rate." *CF&I Fabricators*, 131 B.R. at 492.  So, far, the Court generally agrees. But Ms. Grisham did not charge for typing, data entry, photocopying documents, or the like.  Mr. Pankow testified that he has an administrative assistant to help with such type of tasks but BHFS did not bill for his administrative assistant in the Applications.

Because *CF&I Fabricators*, 131 B.R. 474, dates back to 1991, it did not address electronic filing and docketing.  The Debtor and the UST cite a pair of non-binding decisions for the argument that such services are not compensable:  *In re Mohsen*, 473 B.R. 779, 795 (Bankr. N.D. Cal. 2012); *In re Weaver*, 2011 WL 867136, at *4 (Bankr. D.N.M. Mar. 11, 2011).  In *Mohsen*, the court decided that "approximately 2 hours that represent time spent downloading documents, calendaring deadlines, confirming papers were filed, organizing files, and electronically filing documents" were "non-compensable clerical tasks."  *Mohsen*, 473 B.R. at 795.  The case is not particularly persuasive since it offered no analysis at all on the topic.  Further, it is unclear whether the reference to "electronic filing" referred to internal law firm "electronic filing" (*i.e.*, filing and storing documents internally) or e-filing with the court.  The *Weaver* decision is more detailed. The New Mexico bankruptcy court opined:

> Clerical tasks are generally not compensable from the bankruptcy estate, even if such tasks are performed by paralegals or attorneys.  Such tasks are considered part of office overhead . . . .  Even though some training in using the Court's CM/ECF system is required, filing a document electronically is not a billable task . . . .  It is the type of cost that should be absorbed in a legal firm's office overhead.

*Weaver*, 2011 WL 867136, at *4.  But another more recent New Mexico bankruptcy decision provides a more nuanced view and acknowledges that "[i]t could be  . . .  that some complex e-filing in chapter 11 cases may be compensable."  *In re Hungry Horse, LLC*, 2017 WL 3638182, at *4 (Bankr. D.N.M. Aug. 23, 2017).  In the end, the Court respectfully disagrees with the *Weaver* approach to e-filing documents with the Court.

Instead, the Court looks closer to home for the most compelling guidance on the e-filing and docketing deadline issues.  In *In re McNally*, 2006 WL 2348687 (Bankr. D. Colo. 2006), Judge Tallman explained why e-filing documents may be compensable (even if performed by an attorney):

> . . . the Bankruptcy Court and Clerk's Office over the past
> few years have essentially conscripted attorneys and their
> staffs to be docketing clerks for the Bankruptcy system.
> They are trained for the position and the attorney's CM/ECF
> registration number is now the authority to file documents
> and how they are tracked and policed.  Therefore, the Court
> does not find it surprising or unusual that certain entries may
> reflect that an attorney may have billed a task as efiling.  As
> long as the task is the culmination of a professional service,
> such as drafting or revising a pleading or other document for
> filing; or, such tasks are not excessive in number when
> compared to the total amount of services rendered for the
> case, the Court does not believe the occasional or isolated
> billing for such services to be unreasonable in light of the
> *Johnson* factors so as to require a fee reduction.

*Id.*, at *13.  The foregoing description is entirely accurate and negates the Debtor's and
the UST's attacks on BHFS' Applications.

E-filing documents with the Court requires both specialized training and
professional judgment in determining the proper "event" and linking to the proper
document already in the docket.  It is no longer just a matter of handing a document to a
docketing clerk at the courthouse.  The Court concludes that having a paralegal perform
the task (rather than an attorney) is entirely appropriate, reasonable, and compensable.
Furthermore, Ms. Grisham did not charge excessively for e-filing documents in
comparison to the bulk of her work.

Docketing deadlines also is a task that involves professional judgment (including
application of the Bankruptcy Code, the Federal Rules of Civil Procedure, the Federal
Rules of Bankruptcy Procedure, and the Local Bankruptcy Rules of the District of
Colorado).  The consequences of docketing the wrong deadline can be severe in
bankruptcy cases.  *See McNally*, 2006 WL 2348687, at *12 (explaining possible fatal
consequences of mis-calendaring in Chapter 13 cases and allowing compensation).
The Court enforces deadlines and observes that one of the most common but avoidable
mistakes in bankruptcy practice is missing deadlines.  Best practices suggest that a
paralegal should make the initial calendaring decision which should then be double-
checked by an attorney.  In any event, the Court easily rejects the argument that BHFS
cannot be compensated for calendaring deadlines properly.

Having carefully considered the objections by the Debtor and the UST to Ms.
Grisham's paralegal time, the Court observes that paralegals have an important role to
play in the bankruptcy process and are entitled to appropriate compensation.  The Court
admonishes that time entries should be specific in describing the nature of the services
provided.  Ms. Grisham's billing entries too often were generic.  And, the UST properly
identified about 1.8 hours of generic entries that did not match docket activity in the

Individual Case or the *Morreale Hotels* Case.  On the foregoing basis, and considering the Section 330(a) framework, the Court determines that Ms. Grisham's billings should be discounted by 15% to ensure reasonableness.  However, BHFS already voluntarily reduced Ms. Grisham's fees by about 30% to arrive at its final request for $810,576.13.  Accordingly, the Court need not further reduce BHFS' requested compensation based upon the "clerical in nature" objection.

### 2.   Reasonableness of Rates Charged by BHFS:  Section 330(a)(3)(B) and *Johnson* Factor No. 6.

The principal BHFS lawyers who represented the Trustee in the Individual Case are: Michael J. Pankow; Kinny Bagga; Samuel M. Kidder; and Andrew J. Roth-Moore.  Although Mr. Pankow, the engagement partner, remained a constant presence in the Individual Case, the more junior attorneys rotated.  BHFS supplemented the lawyer team with a primary and very experienced paralegal: Sheila M. Grisham.  During the almost six-year assignment representing the Trustee, BHFS made annual upward adjustments to most billing rates.  However, there was an exception, Mr. Pankow did not increase his billing rate in 2016.  This is important since BHFS performed the majority of its work in 2015 and 2016.  In any event, BHFS charged its professionals at the following rates per hour during the assignment:

| Professional | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|
| Michael J. Pankow | $595 | $595 | $625 | $650 | $675 | $735 |
| Samuel M. Kidder | $285 | $300 | $335 | N/A | N/A | N/A |
| Kinny Bagga | $285 | N/A | N/A | N/A | N/A | N/A |
| Andrew J. Roth-Moore | N/A | N/A | N/A | $300 | $320 | $320 |
| Sheila M. Grisham | $245 | $255 | $265 | $275 | $285 | $295 |

Although the hourly rate increases generally were incremental, for the professionals who worked on the entire engagement (Mr. Pankow and Ms. Grisham), their hourly rates increased by roughly 22% during the five years from 2015 to 2020.  With respect to Mr. Pankow, the evidence at trial established that the foregoing rates for his time represent a discount of $50.00 per hour from his standard rates.

In terms of the volume of work, the most intense time period by far was at the beginning of the Chapter 7 liquidation process in 2015.  As explained previously, after 2015, the amount of work performed steadily decreased every year.  Thus, the lower rates charged by BHFS in 2015 and 2016 are more important for assessment since they applied with respect to most of the work performed.  Although the Debtor repeatedly emphasized the highest hourly rate charged by Mr. Pankow in 2020 ($735), that rate applied to only a small amount of work.  Furthermore, a significant part of the work performed by BHFS in 2018 and 2019 at relatively higher rates pertained to defense of the Second Application and the Trustee's Application.  The Court already has decided to disallow all Fee Defense Attorneys' Fees.

Another way of looking at the hourly rates charged by BHFS is to calculate an average blended hourly professional rate. Taking the total amount of fees requested $810,576.13 divided by the hours expended (about 1,768 hours) yields an average blended hourly professional rate of about $458.47. Such amount is an approximate because BHFS requested less than the amount actually billed. Such rate includes mainly lawyers, but also paralegals. But based on this rough calculation, it is apparent that Mr. Pankow, who had the highest hourly rate during all time periods, performed a substantial amount of the work and also billed the largest number of hours (about 873 hours or 49% of the hours billed according to the Court's estimate). Mr. Kidder, a young associate with a lower rate, billed the second highest number of hours (about 510 hours or 29% of the hours billed according to the Court's estimate). And, over the entire assignment, Ms. Grisham, a paralegal with the lowest hourly rate, billed the third highest number of hours (about 251 hours or 14% of the hours billed according to the Court's estimate). Together, Mr. Pankow, Mr. Kidder, and Ms. Grisham accounted for about 92% of total hours billed. The remaining balance is mainly attributable to a rotating group of associates, including Ms. Bagga and Mr. Roth-Moore.

Having described the facts, the Court turns to the question whether the rates charged by the BHFS professionals were reasonable. The Court received a relative paucity of evidence on the topic. Mr. Pankow, a very experienced bankruptcy professional, testified that the rates were reasonable. Further, the Trustee, who may be the most experienced Chapter 7 Trustee in the United States with many decades under his belt, also testified about the BHFS charges. He characterized the BHFS rates as "on the high end but reasonable under the circumstances." The UST does not dispute the reasonableness of the BHFS hourly rates. The Debtor does. But the Debtor offered no testimony defeating the reasonableness of the BHFS hourly rates. Therefore, based upon the evidence at trial, BHFS established the reasonableness of its hourly rates.

As a further test on the reasonableness of the hourly rates, the Court "may draw on its own experience with attorney charges in bankruptcy cases in this district to determine a reasonable fee." *Weaver*, 2011 WL 867136, at *4; *see also In re Spillane*, 884 F.2d 642, 647 (1st Cir. 1989) (affirming trial court's reduction in approved hourly rate that was based on the trial court's own experience); *In re Hammeken*, 2010 WL 2940801, at *1 (Bankr. D. Ariz. Jul. 21, 2010) (stating that "the court employs its own experience, both as an attorney and as a judge, to attorney fee applications"). The Court has presided over thousands of bankruptcy cases and regularly reviews applications for compensation under Section 330 in Chapter 11 proceedings and complex Chapter 7 cases in which trustees have retained counsel. And, the Court concurs almost entirely with the Trustee: the BHFS hourly rates charged by its professionals are high (certainly in the top quartile of bankruptcy professionals actively practicing in complex Colorado cases); but they are still within the ambit of reasonable for partners, associates, and paralegals.

A few examples from the Individual Case and the *Morreale Hotels* Case also support the Court's conclusion. The Debtor hired Kutner Brinen to represent the corporate debtor in the *Morreale Hotels* Case. The principal engagement partner was,

Lee M. Kutner, a respected and very experienced bankruptcy attorney in this jurisdiction. In 2015, Mr. Kutner charged at the rate of $460 per hour. (UST Ex. C.) Mr. Pankow charged at the rate of $595 per hour in 2015. So, he was about 25% more expensive than Mr. Kutner in 2015. In 2016, Mr. Kutner raised his rate to $500 per hour. (UST Ex. D.) Mr. Pankow did not raise his rate at all in 2016. So, in 2016, the rate difference was only about 18% as between Mr. Kutner and Mr. Pankow. Yet, the Debtor himself hired Mr. Kutner and apparently had no qualms with Mr. Kutner's hourly rate. A rate difference of 18% is not indicative of unreasonableness. Similarly, the Debtor employed several law firms in the Individual Case. His main law firm was Weinman & Associates, P.C. Jeffrey A. Weinman, an experienced bankruptcy attorney in Colorado, billed the Debtor at the rate of $450 per hour in 2014. (Docket No. 318.) That rate is similar to Mr. Kutner's rate in the *Morreale Hotels* Case. Although a bit less than Mr. Pankow's rates in 2015 and 2016, Mr. Weinman's rate for representing the Debtor earlier in the Individual Case shows that Mr. Pankow's rate (albeit high) is not out of bounds. Although the foregoing examples focus on Mr. Pankow's hourly rate because his rate is the highest, the Court reaches similar conclusions with respect to the rates for associates and paralegals in bankruptcy cases.

The Court also has considered other cases in this jurisdiction — not just the Individual Case and the *Morreale Hotels* Case. The rates charged by BHFS are indeed higher than most other law firms appearing in Colorado bankruptcy cases; but they are lower than some. In the end, BHFS' hourly professional rates are high, but not out of line and not unreasonable under Section 330(a)(3)(B).

### 3.    Amount Involved and Results Obtained:  *Johnson* Factor No. 8.

The Court considers the "amount involved and results obtained" factor of paramount importance. After all, the bottom-line results matter a great deal. So, the Court, in its discretion, weighs this factor more heavily than most of the other *Johnson* factors. *See Norman v. Housing Auth. of Montgomery*, 836 F.2d 1292, 1302 (11th Cir. 1988) ("After the lodestar is determined . . . the court must next consider the necessity of an adjustment for results obtained. If the result was excellent, then the court should compensate for all hours reasonably expended."); *In re Allied Computer Repair, Inc.*, 202 B.R. 877, 885 (Bankr. W.D. Ken. 1996) ("numerous courts have held that . . . the results obtained . . . carries the greatest determinative weight"). The results speak for themselves. The Individual Case involved a substantial amount of claims in terms of dollar amount: about $7,674,614.85 as originally filed.[19] The claims pool indicates that the Individual Case falls in the top 1% of individual Chapter 7 liquidations measured by the "amount involved."

BHFS assisted the Trustee in marshalling funds (through asset dispositions including at the *Morreale Hotel* Case level and otherwise) sufficient for the Trustee to pay all creditors who filed claims in the Individual Case and the *Morreale Hotels* Case in

---

[19]    The claims pool changed over time. Duplicate claims were eliminated. Some claims were reduced while other grew. However, the claims originally filed provide a good yard-stick measure of the magnitude of the Individual Case.

full plus interest — whether by disbursements in the *Morreale Hotels* Case or by disbursements in the Individual Case.  Given the overlapping creditor pool as between the Individual Case and the *Morreale Hotels* Case, most of the common creditors technically received distributions in the *Morreale Hotels* Case prior to the surplus flowing down to the Individual Case.  However, the practical and big-picture result is the same: all creditors in the Individual Case and the *Morreale Hotels* Case were paid.  The Trustee even made a substantial interim surplus distribution to the Debtor.  More surplus funds will be available to the Debtor when the BHFS Applications are resolved and the Trustee prepares his Final Report.  Notably, the results obtained by the Trustee and BHFS are leaps and bounds above what the Debtor had repeatedly projected before conversion of the Individual Case to Chapter 7 liquidation.

In the Court's experience, the full payment scenario achieved by the Trustee and BHFS is exceedingly unusual.  Most Chapter 7 cases end with nothing for creditors.  If they are lucky, creditors sometimes receive payment equivalent to a small percentage of their claims.  But, it is almost unheard of for creditors in a Chapter 7 liquidation to be paid in full plus interest.  And, it is rarer still for a Chapter 7 debtor to receive a significant surplus.  The amounts involved and results obtained weigh strongly in favor of approving the Applications.

### 4.    Novelty and Difficulty of the Questions:  *Johnson* Factor No. 2.

In representing the Trustee in the Individual Case, BHFS was forced to confront numerous thorny and novel legal issues — far more than in the typical Chapter 7 liquidation and also more than in most complex bankruptcy reorganizations.  An important dispute right out of the gate was the Trustee's ability to seize control of the Debtor's member interest in Morreale Hotels, which was the Debtor's most significant asset.  Single-member limited liability companies, like Morreale Hotels, raise numerous difficult legal issues.  Although there is some bankruptcy court guidance on the issue of control (*Albright*, 291 B.R. 538), there is a dearth of appellate precedent.  BHFS assisted the Trustee in navigating these choppy waters and obtaining control of Morreale Hotels.

Then, the Debtor consistently and aggressively sought to intervene in the Trustee's proposed actions.  The Debtor's arguments required the Court to address numerous complex standing issues.  *See Morreale*, 2015 WL 3897796.  Unusually, the Debtor even asserted a claim against himself to try to establish standing.  BHFS represented the Trustee in hearings and a trial on the standing matters and ultimately prevailed by obtaining a ruling from the Court rejecting the Debtor's standing to attack the Trustee's actions.  But, that did not stop the Debtor.  He started to use proxies including Sketch Restaurant (an entity that he purported to manage) and Belladonna LLC (an entity controlled by his fiancé which acquired a claim against the Debtor).  All the maneuvering led to an unusually difficult set of disputes threatening to derail the Trustee's efforts to sell the Broadway Property and Colfax Property.  Again, BHFS capably represented the Trustee throughout and ensured the sale of the Broadway Property and Colfax Property for the benefit of creditors.

Later still BHFS assisted the Trustee in connection with confirmation issues for a plan at the *Morreale Hotels* Case level.  There were many novel and hotly-contested issues.  However, in the end, the Trustee was able to achieve confirmation and cause a surplus to be distributed from the *Morreale Hotels* Case to the Individual Case.  Subsequently, BHFS represented the Trustee is a series of more difficult fights concerning the Debtor's efforts to curtail the bankruptcy process through dismissal.

Overall, the Court concludes that BHFS' work involved more difficult and novel legal questions than almost any other Chapter 7 liquidation the Court has ever encountered.  To say it was not easy is a serious understatement.  The tough and novel legal issues factor supports award of the fees requested by BHFS as reasonable.

**5.**       **Skill Necessary to Perform Legal Services:   *Johnson* Factor No. 3.**

As set forth in the Court's description of the Individual Case and its relationship with the *Morreale Hotels* Case, the Individual Case is a complex bankruptcy proceeding which started as a Chapter 11 reorganization and later was converted to Chapter 7 liquidation.  The case was exceedingly contentious.  Virtually every action taken by the Trustee was attacked by the Debtor.  Given the constant litigation, the Individual Case presented a myriad of tough legal issues.

In the Court's estimation, BHFS' engagement as counsel for the Trustee in the Individual Case required a high level of legal skills in numerous areas, including: Chapter 7 liquidation; Chapter 11 reorganization; corporate law; real estate; commercial transactions; bankruptcy litigation; state and federal taxation; asset dispositions; appeals; and the Uniform Commercial Code.  The skill set required was well beyond what normally is needed for routine consumer bankruptcy cases.  Instead, the Trustee required the assistance of counsel skilled in the most significant and complex bankruptcy proceedings in this jurisdiction.  This factor favors the reasonableness of the compensation requested in the Applications.

**6.**       **BHFS' Professional Qualifications:  Section 330(a)(3)(E) and *Johnson* Factor No. 9.**

Both Section 330(a)(3)(E) and the *Johnson* factors dictate that the Court should consider the skill and experience of the professionals seeking compensation.  BHFS is a prominent Colorado-based law firm with a national presence.  The firm has substantial experience in bankruptcy matters.  The principal BHFS lawyers who represented the Trustee in the Individual Case are: Michael J. Pankow; Samuel M. Kidder; and Kinny Bagga.

Mr. Pankow is a shareholder of BHFS and was the lawyer leading the representation of the Trustee.  A 1989 graduate of Creighton University Law School, he is admitted to practice law in the States of Colorado and Nebraska.  For the last 30 years, Mr. Pankow has focused on bankruptcy, reorganization, bankruptcy and commercial litigation, and commercial workout matters.  When his services were

rendered to the Trustee, Mr. Kidder was an associate attorney at BHFS.  He graduated from the UCLA School of Law in 2011.  His practice included bankruptcy matters. When Ms. Bagga performed work for the Trustee, she was an associate attorney at BHFS.  She graduated from the University of Denver Sturm College of Law in 2011. Ms. Bagga also subsequently earned an L.L.M. degree from St. John's University School of Law.  Her practice focused on bankruptcy and corporate matters.  The Court received no evidence that any of the BHFS professionals are "board certified" in any field.

The Court is quite familiar with BHFS and its lawyers, especially Mr. Pankow. The Court concludes that all the BHFS lawyers who rendered services to the Trustee have strong credentials and qualifications to represent the Trustee in the Individual Case.  They all have demonstrated skill and experience in the bankruptcy field.  This factor favors the reasonableness of the fees noted in the Applications.

### 7. Timeliness of the Services Provided by BHFS:  Section 330(a)(3)(D) and *Johnson* Factor No. 7.

Section 330(a)(3)(D) mandates that the Court consider whether the services "were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed."  Having presided over the Individual Case for many years, the Court is aware of numerous disputes and hearings called on short notice, especially in 2015 and 2016 when the bulk of BHFS' work was performed.  BHFS never missed a deadline.  Based on the Court's familiarity with the Individual Case, extensive review of the Docket in the Individual Case, and review of the BHFS time records, the Court determines that BHFS performed its services in a timely fashion serving the needs of the Trustee.  However, the Court expects that capable professionals meet time requirements in every case.  Thus, while this factor favors approval of the compensation requested by BHFS, the Court does not ascribe much weight to such factor in the Individual Case.

### 8. Customary Compensation:  Section 330(a)(3)(F) and *Johnson* Factor Nos. 5 and 12.

Section 330(a)(3)(F) directs the Court to consider whether BHFS' charges are "reasonable based on customary compensation charged by comparably skilled practitioners" in non-bankruptcy cases.  BHFS customarily charges for its legal services outside of bankruptcy on an hourly basis utilizing a "standard rate."  Mr. Pankow testified that with respect to the Individual Case engagement, he applied a "non-standard" discount of $50.00 per hour to his customary rates throughout the entire Individual Case.[20]  For example, in 2015, Mr. Pankow's standard rate was $645.00.  He regularly charged that rate for work outside of bankruptcy.  But he billed the Trustee at the discounted rate of $595.00 per hour.  On a percentage basis, the $50.00 per hour discount amounted to a reduction of about seven percent (7%) in Mr. Pankow's

---

[20]      BHFS did not introduce evidence that the standard rates for BHFS personnel other than Mr. Pankow were discounted.

standard hourly rates. In terms of an overall dollar discount, over the entire engagement, Mr. Pankow charged about 873 hours. So, the $50.00 per hour discount resulted in cost savings of about $43,650.00 as compared to the customary rates.

BHFS made another concession from its customary charges. Typically, BHFS bills its clients a two and a half percent (2.5%) "administrative fee" based upon attorney's fees. BHFS does not separately track and bill for photocopies, telephone charges, postages and the like. Instead, the 2.5% administrative fee is designed to recoup such expenses. For the engagement with the Trustee in the Individual Case, BHFS agreed to waive the administrative fee. This is borne out in the billing statements attached to the Applications which do not include charges for photocopies, telephone charges, postages and the like. Instead, the costs BHFS is seeking to recover in the Applications are for hard costs for third-party services such as Westlaw and Lexis legal research, filing fees for court filings, courier costs, transcript charges, telephone conference services, and litigation support (including large volume document production). The total fees charged by BHFS in the Applications are $799,935.50. If BHFS had charged the standard 2.5% administrative fee, that would have amounted to an additional $19,998.39. So, BHFS contends that it has effectively discounted its request for costs by that amount.

As the Court considers customary compensation, the Court does not limit the inquiry to what is customary for BHFS vis-à-vis what it charges its other clients outside of bankruptcy. The parties did not provide the Court much guidance beyond the foregoing.[21] However, the Court is familiar generally with rates and charges by law firms for non-bankruptcy work by reason of attorney claims made in bankruptcy cases and also by the retention of counsel in bankruptcy cases to perform non-bankruptcy work (such as defense of federal and state court lawsuits and participation in arbitrations). The Court's information suggests that the fees charged by BHFS are high, but not out of the range of reasonableness for other types of engagements. Thus, the fees requested by BHFS appear reasonable under this factor.

### 7.    Undesirability of Case: *Johnson* Factor No. 10.

The Court does not assess the Individual Case as being particularly undesirable for BHFS — at least at the time BHFS was retained on February 27, 2015. At that stage, the Individual Case was notable in terms of the amount of claims. However, the Debtor also owned substantial assets. Although payment of administrative expenses in Chapter 7 is not guaranteed, a fair assessment at the start of the engagement would have suggested that the case was likely to be administratively solvent such that the law firm probably would be paid for its compensable work. Over time (including through the sale of the Broadway Property and the Colfax Property), administrative solvency became virtually certain. So, BHFS faced little risk of non-payment fees and costs approved by the Court. On the other hand, as time passed, the Individual Case may

---

[21]    Counsel for the Debtor referenced a 2017 Economic Survey from the Colorado Bar Association in cross-examination of Mr. Pankow. However, the 2017 Economic Survey was not admitted into evidence so the Court did not consider it.

have seemed less desirable for BHFS as BHFS professionals and the Trustee suffered constant attacks.  Notwithstanding, in the overall calculus of the Individual Case, the "undesirability" *Johnson* factor is not significant when assessing reasonableness of the amounts listed in the Applications.

### 8.       Nature of BHFS' Relationship with the Trustee:  *Johnson* Factor No. 11.

The Trustee has a strong relationship with BHFS.  The Trustee and Mr. Pankow have known each other for decades.  They are both regulars in the rarified space of complex Colorado bankruptcy cases.  The Trustee selected BHFS from a field of many other qualified candidates.  Trustees generally have the right to select counsel of their choosing (subject to the requirements of Section 327).  The Trustee has worked well with BHFS throughout the pendency of the Individual Case and vice-versa.  The Trustee, who is one of the most experienced Chapter 7 Trustees in the United States, testified at trial in favor of BHFS.  He contends that BHFS provided valuable services to him, and services which were extremely beneficial to the estate.  The client support and confidence are notable.  However, the nature of BHFS' relationship with the Trustee does not weigh greatly in the reasonableness calculus.

### 9.       Preclusion of BHFS' Other Employment Opportunities:  *Johnson* Factor No. 4.

BHFS spent approximately 1,768 hours representing the Trustee in the Individual Case over a six-year period.  Such work precluded BHFS professionals from working for other clients while assisting the Trustee; but only to the extent of the hours actually spent on the Individual Case engagement.  Put another way, since BHFS spent about 1,768 hours working for the Trustee, obviously they were not able to charge those same hours to other clients.  Nevertheless, there is no evidence that BHFS' engagement was so all-consuming that the law firm was forced to turn down other employment opportunities.  This factor carries no real weight in assessing the reasonableness of the fees contained in the Applications.

### V.       Conclusion.

As the final act in this dispute, the Court concludes that BHFS provided benefit to the Individual Case estate and should be compensated.  Reasonable compensation starts with the lodestar amount requested by BHFS: $810,576.13 (which includes fees and costs).  For the reasons set forth above, the Court determines that it must disallow and subtract the following amounts from the requested compensation: (1) $143,362.00 in Fee Defense Attorneys' Fees; (2) $1,761.12 in Fee Defense Costs; (3) $16,367.00 for the Questionable Entries pertaining to the split benefit with the *Morreale Hotels* Case; and (4) $10,000 for work related to the *Digital Cowboy* Action.  The net result is: $639,086.01.  Under Section 330(a)(5), there must be an offset for compensation already received on an interim basis.

Accordingly, the Court ORDERS:

BHFS shall be allowed aggregate compensation for fees and costs in the amount of $639,086.01 under Section 330.

BHFS already received $352,240.61 in interim fees and costs for the First Application and Second Application.  BHFS shall be permitted to retain that interim compensation, but it must be offset.

The Trustee shall be permitted to pay BHFS the remaining balance of allowed compensation:  $286,845.40.

DATED this 31st day of December, 2020.

BY THE COURT:

Thomas B. McNamara,
United States Bankruptcy Judge